[No. S134920. July 17, 2006.]

RICK AUERBACH, as Assessor, etc., Plaintiff and Appellant, v.
ASSESSMENT APPEALS BOARD NO. 1 FOR THE COUNTY OF LOS
ANGELES, Defendant and Respondent;
NORTHERN TRUST BANK OF CALIFORNIA, as Trustee, etc., Real Party
in Interest and Respondent.

154

## COUNSEL

Raymond G. Fortner, Jr., County Counsel, and Albert Ramseyer, Deputy County Counsel, for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Bill Lockyer, Attorney General, and William L. Carter, Deputy Attorney General, for California State Board of Equalization as Amicus Curiae on behalf of Defendant and Respondent.

Rodi, Pollock, Pettker, Galbraith & Cahill, Cris K. O'Neall, C. Stephen Davis, Wade E. Norwood; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., William E. Thomson and Casey N. Carrington for Real Party in Interest and Respondent.

OPINION

**CHIN, J.**—Proposition 13, adopted in 1978, limits the amount that the assessed value of real property may be increased to reflect increases in the property's actual market value. When ownership of the property changes, however, the property may be reassessed at its current market value. (See *Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155 [2 Cal.Rptr.2d 536, 820 P.2d 1046] (*Pacific Southwest*).) Changing the assessed value of real property to its current market value can result in a substantial increase in the tax on that property. Thus, determining whether and when a change of ownership has occurred can have significant tax consequences.

Here, the ownership of land subject to a 20-year lease has changed. We must decide whether a building on that land, constructed after the lease had commenced, has also changed ownership. The answer depends on who owns the fee or equivalent interest in the building for these purposes—the lessor or the lessee. We conclude that, for purposes of Proposition 13, the lessor owns the building as well as the land. Accordingly, the change in ownership of the land also changed ownership of the building. We affirm the judgment of the Court of Appeal, which reached a similar conclusion.

## I.  FACTS AND PROCEDURAL HISTORY

Robert and Electra Anderson (the grandchildren) are the grandchildren of Stanley and Marguerite Anderson (the grandparents). Each grandchild is the beneficiary of one of two trusts that together hold a 50 percent interest in property on North Rodeo Drive in Beverly Hills. Real party in interest Northern Trust Bank of California (Northern Trust) is the cotrustee of the trusts. In February 1996, the trusts, along with two other trusts not involved in this litigation, leased the property to Tommy Hilfiger Retail, Inc. (Hilfiger) for 10 years with two five-year options to extend the term. At the time the parties entered the lease, the property was improved with a retail building.

The written lease defined the premises being leased as including the improvements. Paragraph 7.4(a) of the lease, captioned "Ownership," provided: "Subject to Lessor's right to require their removal or become the owner thereof as hereinafter provided in this Paragraph 7.4, all Alterations and Utility Additions made to the Premises by Lessee shall be the property of and owned by Lessee, but considered a part of the Premises." Paragraph 7.4(c) required Hilfiger to "surrender the Premises by the end of the last day of the Lease term or any earlier termination date, with all of the improvements, parts and surfaces thereof clean and free of debris and in good

operating order, condition and state of repair, ordinary wear and tear excepted." A provision in an addendum to the lease, also captioned "Ownership," stated: "During the term of this Lease, the Improvements shall be the property of and owned by Lessee but considered a part of the Premises. The Improvements shall, at the expiration or earlier termination of this Lease, become the property of Lessor and remain upon and be surrendered by Lessee with the Premises." Another lease provision gave the lessor authority to eject Hilfiger from the premises for a breach of the lease. Under the lease, any proceeds from the taking of any part of the premises by eminent domain belonged to the lessor.

The lease required Hilfiger either to renovate the existing retail building on the property with a minimum expenditure of $2 million or to demolish it and build a new one with a minimum expenditure of $4 million. It provided for certain rent credits depending on which of these options Hilfiger chose. It also stated that "[a]ll monetary obligations of Lessee to Lessor under the terms of this Lease are deemed to be rent." It gave the trusts, as the lessor, certain control over changes to the existing building, including approval of any architectural plans, alterations, or construction of new improvements. It also recognized that Hilfiger intended to construct a " 'Flagship' location" on the premises and stated that the lessor agreed to cooperate in this regard. The lease also required the lessor's consent for Hilfiger to mortgage or encumber the improvements, or to assign or transfer the leasehold.

The lease contemplated that the lessor would have authority "to finance, refinance, or sell the Premises, any part thereof, or the building of which the Premises are a part . . . ." It required Hilfiger to pay the real property taxes, but required the lessor to pay any increase in real property taxes due to, or resulting from, the sale of the premises. It also required Hilfiger to repair any damage to the property at its expense, but required the lessor to make any insurance proceeds available to Hilfiger for the repairs. The lease did not specifically state whether the monthly rent was for the land or the building, or both, but the evidence established that Hilfiger paid rent for the land, and not for the building.

Hilfiger chose to demolish the existing building and build a new one, at a cost of $20 million. It completed and occupied the new building in late 1997. The new building was assessed as new construction at that time. Thereafter, Hilfiger paid all expenses associated with the building.

On June 16, 1999, John Anderson, the grandchildren's father, died. The parties agree that under the terms of the trusts, this event transferred ownership of the trusts' interests in the property from the grandparents to the grandchildren. The grandchildren applied for the $1 million grandparent-grandchild reassessment exclusion under Revenue and Taxation Code section

63.1.[1] Rick Auerbach, the Los Angeles County Assessor (Assessor) granted the exclusion. However, taking the position that the trusts owned the building as well as the land for property tax purposes, the Assessor applied the exclusion to both on a pro rata basis. It allocated approximately 92 percent of the exclusion to the building and 8 percent to the land. Northern Trust, as trustee for the grandchildren, contested this allocation before the Los Angeles County Assessment Appeals Board No. 1 (Board). It contended that the trusts owned only the land and not the building, and thus the entire exclusion applied to the land.

After holding an evidentiary hearing, the Board ruled in the grandchildren's favor. It concluded that Hilfiger, rather than the trusts, owned the building and directed the Assessor to apply the exclusion solely to the land. It relied on the following facts to support this conclusion: "The Agreement [i.e., the lease] states that ownership of the new improvements was held by Hilfiger once the new improvements were completed in 1997. Other provisions in the Agreement support the conclusion that the Trusts and Hilfiger intended the new improvements to be owned by Hilfiger for as long as Hilfiger was leasing the land on which the new improvements were located. For example, the elimination of all references in the Agreement to lessor ownership of improvements, the provisions relating to payment of rent only for the use of the land, and the requirement that insurance loss proceeds received by the Trusts for any damage to the improvements be forwarded to Hilfiger all demonstrate that Hilfiger owned the new improvements constructed at the Property.

"The actions and practices of the Trusts, [the grandchildren], and Hilfiger also support the conclusion that Hilfiger owned the new improvements as of June 16, 1999. First, Hilfiger built the new improvements at its own cost. Second, Hilfiger paid all expenses related to operation of the new improvements. Third, the Trusts [the grandchildren] had no right or claim to possess or occupy the new improvements in 1999, nor did they do so at any time. All benefits associated with the use and occupancy of the new improvements went to Hilfiger, and not to the Trusts or to [the grandchildren]. This is most clearly supported by the absence of any rental payments by Hilfiger for the new improvements."

The Assessor filed a petition for writ of mandate in the superior court challenging the Board's decision. The court agreed with the Board and denied

---

[1] All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

Section 63.1 provides, in relevant part, that when grandparents transfer ownership of real property that is not their principal residence to their grandchildren, the first $1 million of its value is excluded from reassessment if the grandchildren's parents are deceased.

the petition. The Assessor appealed. A divided Court of Appeal reversed the judgment. In an opinion authored by Acting Presiding Justice Mallano, the majority concluded that "notwithstanding the lessee's construction of the improvements, both the land and the improvements are subject to, and included in the calculation of, the grandparent-to-grandchild exclusion." Justice Vogel dissented, concluding that the Board and superior court reached the correct decision. We granted Northern Trust's petition for review.

## II. Discussion

■ Proposition 13 generally limits the maximum amount of any ad valorem tax on real property to 1 percent of its "full cash value." (Cal. Const., art. XIII A, § 1, subd. (a).) The Constitution defines "full cash value" as the county assessor's valuation of the property on the 1975–1976 tax bill "or, thereafter, the appraised value of real property when purchased, newly constructed, or a *change in ownership* has occurred after the 1975 assessment." (*Id.*, § 2, subd. (a), italics added.) This appraised value may be adjusted for inflation from year to year but only at a maximum rate of 2 percent per year. (*Id.*, § 2, subd. (b).)

The issue in this case is to what extent a "change in ownership" (Cal. Const., art. XIII A, § 2, subd. (a)) occurred when the trusts' interest in the property on North Rodeo Drive changed from the grandparents to the grandchildren. The parties agree that the *land* changed ownership, but they disagree whether the change in ownership included the *building* as well. Northern Trust contends that Hilfiger now owns the building for real property tax purposes under the California Constitution (Cal. Const., art. XIII A, § 2, subd. (a)), and thus the change in ownership of the trusts' interest in the property did not include the building. The Assessor contends that, for these purposes, the trusts continue to own the building as well as the land, and thus the change in ownership included both. The difference in these positions has substantial practical significance. The grandparent-grandchild reassessment exclusion of section 63.1 permits the first $1 million of the value of the property that changed ownership to be excluded from the reassessment. The land and building together obviously have far greater value than the land alone. Under Northern Trust's position, the entire $1 million exclusion would apply to the value of the land. Under the Assessor's position, the $1 million exclusion would have to be prorated between the value of both the land and the building, resulting in a far greater reassessment than if the entire exclusion applied to the land.

This issue is governed by statute. In *Pacific Southwest, supra,* 1 Cal.4th 155, we explained the relevant statutory and analytical framework for deciding this issue. Proposition 13 did not itself define "change in ownership," so

it fell to the Legislature to do so. A broad-based 35-member task force studied the matter. "The panel's work culminated in the Report of the Task Force on Property Tax Administration (hereafter task force report), which was submitted to the Assembly Committee on Revenue and Taxation on January 22, 1979." (*Pacific Southwest, supra,* at p. 161.) The task force report made various recommendations, which resulted in the enactment of the Revenue and Taxation Code provisions at issue here. The key provisions relevant here are section 60, which contains the basic change-in-ownership test; section 61, which contains examples of what *is* a change in ownership; and section 62, which contains examples of what is *not* a change in ownership. (See *Pacific Southwest, supra,* at pp. 161–162.)

"The task force report drafters stressed the need for uniformity and consistency in the application of section 60's general rule." (*Pacific Southwest, supra,* 1 Cal.4th at p. 161.) Accordingly, it recommended that this general definition control *all* transfers. The task force also recommended giving specific examples of what is and is not a change in ownership, which are set forth in sections 61 and 62. It stressed, however, that these examples must be *consistent* with section 60's general test. " 'The entire statutory design would be destroyed by providing statutory treatment for specific transfers which are inconsistent with the general test. In that case, the general test would be overruled by the specific rules and the entire statutory design might be held invalid because of the lack of any consistent, rational interpretation of the constitutional phrase, "change in ownership." ' " (*Pacific Southwest, supra,* at pp. 161–162, quoting the task force report.) "Because the Legislature, in enacting section 60, adopted its language verbatim after reviewing the task force report, it is evident that the Legislature intended for section 60 to contain the overarching definition of a 'change in ownership' for reassessment purposes." (*Id.* at p. 162.) Accordingly, we turn to section 60 to determine whether the building changed ownership for reassessment purposes.

Section 60 provides: "A 'change in ownership' means a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." Its "governing test contains three parts: 'A "change in ownership" means [1] a transfer of a present interest in real property, [2] including the beneficial use thereof, [3] the value of which is substantially equal to the value of the fee interest.' To determine whether the transaction in the case at bar worked a change in ownership under Proposition 13, we begin with that test." (*Pacific Southwest, supra,* 1 Cal.4th at p. 162.) In *Pacific Southwest,* we found that the transaction at issue (a sale and leaseback) met section 60's test and, hence, that it

resulted in a change of ownership. (*Pacific Southwest, supra,* at p. 166.) As we explain, we reach a similar conclusion regarding the building here.

The parties agree that the trusts own the land and thus have a present interest in it, even though it is currently being leased to Hilfiger. The question here solely concerns who owns the building. Before entering into the lease with Hilfiger, the trusts clearly owned the then existing building as well as the land. If, as the Assessor argues, the trusts also own the newly constructed building, then a change of ownership of that building has occurred. But Northern Trust argues that Hilfiger owns the new building. It relies primarily on the facts that the lease provides that Hilfiger "own[s]" the building during the term of the lease, Hilfiger built it at its own expense, and Hilfiger pays no rent for it. If Northern Trust is correct, the change of the trusts' interest in the property from the grandparents to the grandchildren did not change ownership of the building.

■  The general purpose of section 60, evident from its three subdivisions, is to ensure that it is the *fee* interest, or its equivalent value, that is generally subject to property taxation, and that tax reassessment follows the fee interest or its equivalent through various changes in ownership. In this case, for purposes of a section 60 change in ownership, Hilfiger does not own the fee interest in the building, or its equivalent, but owns an estate of lesser value. The trusts owned the fee interest in the entire premises before they entered into the lease, and they still own the fee interest.

■  The lease states that Hilfiger "own[s]" the building during the term of the lease. Whatever this might mean for other purposes, this statement is not dispositive for purposes of section 60's change-of-ownership test, which is all that we are deciding here. The lease also provides that the building will become the lessor's property at the end of the lease. It made Hilfiger's ownership "[s]ubject to" the requirement that Hilfiger surrender the improvements to the lessor when the lease ended, as well as circumscribed by the lessor's authority to eject Hilfiger from possession for a breach of the lease. Hence, for purposes of Proposition 13, Hilfiger has a leasehold interest in the building or at most a possessory interest in an estate for years, not ownership of the fee interest. The fee interest in the entire premises, including the building, remains with the trusts. As we explained in *Pacific Southwest,* "A freehold estate is distinguished from other forms of estates in that it is of indeterminate duration [citations]. But an estate for years . . . is not a freehold estate. (Civ. Code, § 765.) Indeed, under California law an estate for years is not real property at all but rather a chattel real—a form of personalty—even though the substance of the estate, being land, is real property. (*Id.,* §§ 761,

765 . . . .) [¶] Notwithstanding the fact that a lease is a present possessory interest in land, there is no question that as a nonfreehold estate it is a different species of interest from a freehold estate in fee simple. . . . A leasehold is not an *ownership* interest, unlike the possession of land in fee simple . . . . It is for that reason that common parlance refers to the 'owner' of a freehold estate, encumbered or unencumbered, but to the 'holder' of a lease; the freeholder is seised of land, whereas the leaseholder is not." (*Pacific Southwest, supra*, 1 Cal.4th at pp. 162–163, italics added.)

Other provisions of the lease support the conclusion that, for purposes of section 60, the trusts have a present interest in the building. The trusts retained the right to sell the premises, including the building. Although the lease made the lessees responsible for paying property tax, it provided that the lessor would pay any increase in that tax caused by the lessor's sale of the property. The lease required Hilfiger to either remodel or replace the building at its own expense, but it provided certain rent credits depending on which option Hilfiger chose. It also required Hilfiger to turn the building over to the trusts in good condition at the end of the lease period or at the termination of the lease. Hilfiger's remodeling or rebuilding was subject to approval of the trusts, and Hilfiger could not transfer any of its interest in the premises without the trusts' approval. Additionally, the lease provided that any proceeds from the taking of any part of the premises by eminent domain belonged to the lessor.

■ The "beneficial use" of the building also transferred. "The second prong of section 60 requires that to constitute a change in ownership there must be a transfer not only of bare legal title but also of the transferor's beneficial or equitable interest in the land." (*Pacific Southwest, supra*, 1 Cal.4th at p. 163.) Northern Trust argues that the trusts do not have beneficial use of the building because they neither have the right to occupy it nor receive monthly rent for it. We disagree. ■ "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." (Evid. Code, § 662, quoted in *Pacific Southwest, supra*, at p. 164.) The receipt of rent for leased property may constitute beneficial use because it represents enjoyment of the value of the property. (*Pacific Southwest, supra*, at p. 164.) But receiving rent is not the only way a lessor may have the beneficial use of property. The lease required Hilfiger to pay millions of dollars to construct a building that was subject to the lessor's right of sale or eviction during the lease, and that would belong to the lessor at the end of the lease. It also required Hilfiger to surrender the building in good condition. Moreover, the lease itself provided that all of Hilfiger's monetary obligations under the lease, including the requirement that Hilfiger either renovate or replace the existing building, constituted rent. All this, we believe, gave the trusts beneficial use of the property for these purposes.

■ For purposes of section 60, ownership also refers to an interest "substantially equal to the value of the fee interest." "In enacting the third prong of section 60 the Legislature meant to insulate from Proposition 13's effect transfers in which only an estate of lesser value [than fee simple] was conveyed." (*Pacific Southwest, supra,* 1 Cal.4th at p. 165.) A leasehold interest, particularly a lengthy one, has a substantial value, one that can approach the value of the fee interest. But rather than evaluate every leasehold interest on a case-by-case basis to determine whether it has a value substantially equal to that of the fee interest, the statutory scheme provides specific rules. Sections 61 and 62 include examples of ownership that should be treated as substantially equal to the value of a fee interest. As relevant here, section 61, subdivision (c), provides that a change in ownership includes "(1) The creation of a leasehold interest in taxable real property for a term of 35 years or more (including renewal options) . . . ; or (2) any transfer of a lessor's interest in taxable real property subject to a lease with a remaining term (including renewal options) of less than 35 years. [¶] Only that portion of a property subject to that lease or transfer shall be considered to have undergone a change in ownership." Conversely, section 62, subdivision (g), provides that a change in ownership does *not* include "[a]ny transfer of a lessor's interest in taxable real property subject to a lease with a remaining term (including renewal options) of 35 years or more."[2]

■ Sections 61 and 62 thus provide that leasing property for 35 years or more changes ownership, even though technically the fee interest does not change, but leasing property for a shorter time period does not change ownership.[3] Conversely, a lessor's transferring property subject to a lease for 35 years or more does not change ownership (ownership had already changed when the leasehold interest was created); but transferring property subject to

[2] The rule the State Board of Equalization adopted to implement these provisions is substantially similar. California Code of Regulations, title 18, section 462.100, provides as relevant: "(a) The following transfers of either the lessee's interest or the lessor's interest in taxable real property constitute a change in ownership of such real property: [¶] (1) Lessee's Interest: [¶] (A) the creation of a leasehold interest in real property for a term of 35 years or more. [¶] . . . [¶] (2) Lessor's Interest: [¶] (A) The transfer of a lessor's interest in taxable real property subject to a lease with a remaining term of less than 35 years. [¶] . . . [¶] (b) The following transfers of either the lessee's interest or the lessor's interest in taxable real property do not constitute a change in ownership of such real property. [¶] (1) Lessee's interest: [¶] (A) The creation of a leasehold interest in real property for a term of less than 35 years. [¶] . . . [¶] (2) Lessor's interest: [¶] (A) The transfer of a lessor's interest in real property subject to a lease with a remaining term of 35 years or more, whether to the lessee or another party. [¶] (c) Once a change in ownership of taxable real property subject to a lease has been deemed to have occurred, the entire property subject to the lease is reappraised (i.e., the value of both the lessee's interest and the reversion)."

[3] A State Board of Equalization regulation applies the same rule to an estate for years. (Cal. Code Regs. tit. 18, § 462.060, subd. (b) ["The creation of an estate for years for a term of 35 years or more in real property is a change in ownership at the time of the transfer unless [(listing circumstances not relevant here)]."].)

a shorter lease *does* change ownership. We explained this rule in *Pacific Southwest.* "[T]he Legislature decided, following the task force's recommendation, that the creation of a 35-year lease would achieve a change in ownership (§ 61, subd. (c)(1)) because the length of the lease would give the lessee's interest some of the practical attributes of a conveyance of fee simple. A lease of such duration will constitute the main economic value of the land, even though the leaseholder does not own a freehold estate—lenders are, in the report drafters' view, willing to lend on the security of such an instrument. (See task force rep., *supra,* at pp. 39–41.)" (*Pacific Southwest, supra,* 1 Cal.4th at p. 165.)

Thus, the Legislature has determined that a leasehold interest of 35 years or more has a value substantially equal to the value of a fee interest, but a leasehold interest for a shorter time does not have that value. Here, the lease, even including renewal options, was for less than 35 years. Accordingly, it does not fall within section 61's 35-year-lease provision. Because section 61 provides a specific rule, there is no need to determine the value of the leasehold estate on a case-by-case basis. Applying this specific rule rather than trying to determine whether a given leasehold interest has a value substantially equal to the value of the fee estate is consistent with the task force's perceived "need for uniformity and consistency in the application of section 60's general rule." (*Pacific Southwest, supra,* 1 Cal.4th at p. 161.) Under the specific rule, this lease did not transfer the fee interest in the building or its equivalent from the trusts to Hilfiger.[4]

For these reasons, we conclude that the trusts, and not Hilfiger, own the building for purposes of determining whether a change of ownership has occurred under section 60. The change in ownership of the trusts' interest in the property included the building as well as the land.

### III.  CONCLUSION

We affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Corrigan, J., concurred.

---

[4] In support of its conclusion, the Court of Appeal stated that because "this case falls squarely within section 61, subdivision (c)," "a factual analysis of the factors in section 60 is unnecessary." We agree with Northern Trust and amicus curiae State Board of Equalization that this formulation is, at the least, confusing. A factual analysis of section 60's factors is always necessary. Section 60 provides the "overarching definition" of a change in ownership. (*Pacific Southwest, supra,* 1 Cal.4th at p. 162.) The examples found in sections 61 and 62 must be interpreted in light of this definition. But, as explained, our analysis of section 60 convinces us that the building did change ownership along with the land. Accordingly, we agree with the Court of Appeal's conclusion, although not all of its reasoning.

**MORENO, J., Concurring and Dissenting.**—I agree with the result and most of the reasoning of the majority opinion. I write separately because I disagree with the majority's conclusion that Tommy Hilfiger Retail, Inc. (Hilfiger) has only "a leasehold interest" in the building that it built at its own expense, operates, and owns under the terms of the lease. (Maj. opn., *ante*, at p. 162.) In my view, the trusts own the land, but under the terms of the lease, Hilfiger owns the building until the expiration of the lease, at which time ownership of the building transfers to the trusts.

The lease granted Hilfiger the right, which Hilfiger exercised, of constructing a new building, at Hilfiger's expense, on the land owned by the trusts and leased by Hilfiger. The lease states: "During the term of this Lease, the Improvements shall be the property of and owned by Lessee but considered a part of the Premises." The lease further provides that, when the lease terminated, ownership of the building would be transferred to the trusts. This type of arrangement is known as a ground lease. A ground lease "differs fundamentally from the usual lease of space for an office or store in a number of respects, including the following. [¶] First, the improvements on the land . . . generally are owned or become owned by the lessee. . . . If the land is improved, the most common arrangements call for the lessee either to demolish the improvements and construct his own or to purchase the improvements as personal property severed from the land (though in all practical respects they are to be regarded as real property)." (Grenert, Ground Lease Practice (Cont.Ed.Bar 1971) § 1.1, p. 7.)

We addressed a related arrangement in *Dean v. Kuchel* (1950) 35 Cal.2d 444 [218 P.2d 521], in which "the state leased real property for a 35-year term to a private contractor, who agreed to construct an office building thereon and lease back the property and the building to the state for a 25-year term. If at the end of 25 years all covenants of the lease had been performed by the state, title to the property and building would vest in the state, and in any event full title would vest in the state at the end of 35 years. . . ." (*Los Angeles County v. Nesvig* (1965) 231 Cal.App.2d 603, 610 [41 Cal.Rptr. 918].) Even though title to the building would vest in the state at the end of the 35-year ground lease, we recognized that the contractor owned the building during the 25-year building lease, and would continue to own the building until the end of the ground lease if the state breached the terms of the building lease. (*Kuchel, supra*, at p. 448; see also *Richards v. Pacific S.W. Discount Corp.* (1941) 44 Cal.App.2d 551, 559 [112 P.2d 698] ["the ground lease specifically recites that the building and improvements situated upon the property remained personal property and were owned by the lessee and are not a part of the lessor's estate"].)

In similar fashion, Hilfiger owns the building in the present case until the end of the ground lease. But, as noted above, the lease provides that the building is nevertheless considered a part of the premises. For purposes of property tax assessment under Revenue and Taxation Code section 60, therefore, the building is considered part of the property owned by the trusts. Accordingly, I agree with the result reached by the majority.