[No. G040428. Fourth Dist., Div. Three. Aug. 16, 2010.]

JAMES S. PHELPS, as Trustee, etc., Plaintiff and Appellant, v.
ORANGE COUNTY ASSESSMENT APPEALS BOARD NO. 1, Defendant
and Respondent;
WEBSTER J. GUILLORY, as Assessor, etc., Real Party in Interest and
Respondent.

654

## COUNSEL

Law Office of Paul D. Draper, Paul D. Draper; Law Offices of Mary A. Lehman and Mary A. Lehman for Plaintiff and Appellant.

Freeman Freeman & Smiley, Joanne M. Frasca, Jessica S. Dorman-Davis and Lisa M. Burkdall for Carol B. Phelps as Amicus Curiae on behalf of Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker and Julian B. Decyk for Arthur D. Phelps as Amicus Curiae on behalf of Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Benjamin P. de Mayo, and Nicholas S. Chrisos, County Counsel, and Laurie A. Shade, Deputy County Counsel, for Real Party in Interest and Respondent.

## OPINION

**ARONSON, J.**—Plaintiff James S. Phelps, as trustee of the John Wilson Phelps Trust (trust), challenges the action of respondent Webster J. Guillory, Orange County Assessor (Assessor), in reassessing a shopping center complex (property) held by the trust upon the death of Wilson W. Phelps (Wilson), an income beneficiary of the trust, and the decision of respondent Orange County Assessment Appeals Board No. 1 (appeals board) to uphold the reassessment. Plaintiff contends the transfer of Wilson's interest as an income beneficiary to his four children did not qualify as a change of ownership under Revenue and Taxation Code section 60.[1]

---

[1] All statutory references are to the Revenue and Taxation Code, unless otherwise noted.

For a change of ownership to occur under section 60, there must be "a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." Plaintiff contends the trust's income beneficiaries do not have a present interest in the improvements on the property because the property's lessee and sublessees constructed and owned the improvements. Plaintiff also contends the income beneficiaries do not have the beneficial use of the property because they do not hold legal title. Finally, plaintiff contends that the beneficiaries' interest in the income flowing from the property is not substantially equal to the value of a fee interest because a lifetime income interest is inherently inferior to a fee.

This case returns to us after the California Supreme Court transferred it with directions to vacate our previous decision in this matter and reconsider the cause in light of *Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298 [104 Cal.Rptr.3d 195, 223 P.3d 57] (*Steinhart*). We concluded in our previous opinion the trial court properly denied plaintiff's writ petition seeking to overturn the appeals board's decision and the reassessment. We explained the income beneficiaries had a present interest in the improvements because these improvements constituted part of the property and the lease required the lessee to surrender the improvements to the lessor in good condition at the close of the lease. We also concluded the beneficiaries have the beneficial use of the property because they receive income from it; the law does not require legal title to be held by those who are entitled to the beneficial use of a property. Finally, we noted a lifetime beneficiary receiving the rental value of a parcel of real property is considered under the law to be receiving value substantially equal to the value of the fee interest. After considering *Steinhart*, we find no basis to overturn the trial court's decision and therefore affirm the judgment denying plaintiff's writ petition.

I

FACTUAL AND PROCEDURAL BACKGROUND

The trustor, John Wilson Phelps, created the trust as part of his will in 1945, which became irrevocable upon his death in 1947. The trust held real estate from which it derived income, and distributed the income to its beneficiaries. The trust instrument directed the trust to hold the property in trust during the lifetimes of Adele N. Phelps, Wilson, Arthur D. Phelps, Adele Phelps Spellacy, and the trustor's grandchildren living at the time of his death. The trust is scheduled to terminate on the death of the last survivor of the trustor's children and grandchildren living when the trustor died. Thereafter, the trust corpus will be distributed to the trustor's then living issue on the principle of representation.

Among the trust's income producing assets are parcels of real property in Fullerton now used as a shopping center. The trustees executed a lease of the property in 1964 to Montgomery Ward & Co. The lease required the lessee to construct improvements on the unimproved land subject to the lessor's approval. The lessee agreed to surrender the improvements in good condition to the trust at the termination of the lease.

After Montgomery Ward & Co. went bankrupt, Target Corporation (Target) became the current lessee of the property. When Target took over, it spent approximately $7 million to renovate the main store on the property. Both Montgomery Ward and Target subleased portions of the property (retail and restaurant pads) to others that constructed improvements for retail and restaurant use. These improvements were constructed by the sublessees at their own expense and are owned by the lessee or sublessees for the duration of the lease. At the conclusion of the lease, these improvements are surrendered to the trust.

Upon the trustor's death, trust provisions directed the trustees to divide the trust's income among the trustor's widow and his three children. The trust provided that if any of the trustor's children died before the termination of the trust, their issue would take per stirpes. If any of the trustor's children died without issue, the decedent's share of the trust's net income was to be divided among the other children.

As of January 2002, the trust had three trustees, Wilson, John W. Phelps II, and James S. Phelps, who collectively held legal title to the trust's assets. Wilson held a one-third interest as an income beneficiary. Wilson died in April 2002. Under the trust document, Wilson's interest in the net income of the trust was transferred to his four children, each of whom then became entitled to receive 1/12 of the trust's net income.

The assessor concluded the transfer of Wilson's interest to his four surviving children was a change in ownership under section 60 and reassessed their share of the property. The assessor appraised the entire property at $27,740,000 for the 2002 tax year, with the land valued at $14,740,000, and the improvements valued at $13 million. Target paid all of the assessed real property taxes and the trust subsequently filed an application to challenge the assessments with the appeals board. After a hearing, the appeals board upheld the assessor's position as to the parcel involved in this appeal.[2] The trust filed its verified petition for writ of mandate in the superior court,

---

[2] The reassessments were issued against property described as parcels 10, 11, and 14. The appeals board ruled in favor of the trust as to parcel 10, and the trust has received a refund of the taxes paid on that assessment. The trust challenges only the board's findings as to parcels 11 and 14.

seeking to set aside the board's findings. After a hearing, the trial court denied the petition, concluding the transfer on Wilson's death constituted a change in ownership under section 60, entitling the Assessor to reassess the property.

## II

### STANDARD OF REVIEW

"The interpretation and application of section 60 is a question of law. We review de novo a determination that an assessable change in ownership occurred under section 60." (*Reilly v. City and County of San Francisco* (2006) 142 Cal.App.4th 480, 487 [48 Cal.Rptr.3d 291] (*Reilly*).)

## III

### DISCUSSION

A.  *Wilson Held a Present Interest in the Property's Improvements, Which Passed to the New Income Beneficiaries*

On June 6, 1978, California voters passed Proposition 13, officially titled the "People's Initiative to Limit Property Taxation." Proposition 13 amended the California Constitution by adding article XIII A, which provides that "[t]he maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property." (Cal. Const., art. XIII A, § 1, subd. (a).) The term " 'full cash value' means the county assessor's valuation of real property as shown on the 1975–76 tax bill . . . , or, thereafter, the appraised value of real property when purchased, newly constructed, *or a change in ownership* has occurred after the 1975 assessment." (Cal. Const., art. XIII A, § 2, subd. (a), italics added.)

Proposition 13 left the phrase "change in ownership" undefined. To "create consistent and uniform guidelines to implement Proposition 13's undefined 'change in ownership' provision," the Legislature established a 35-member Task Force on Property Tax Administration (task force). Members included legislative and Board of Equalization staff, county assessors, trade associations, and lawyers in the public and private sectors. (*Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155, 161 [2 Cal.Rptr.2d 536, 820 P.2d 1046] (*Pacific Southwest*).) The task force's work culminated in the Report of the Task Force on Property Tax Administration (task force report), which was submitted to the Assembly Committee on Revenue and Taxation

on January 22, 1979.[3] The task force report provided recommendations that the Legislature adopted largely unchanged in a series of code provisions.

The task force report's key change-in-ownership test was adopted verbatim and is now codified as section 60, which has three parts: " 'A "change in ownership" means [1] a transfer of a present interest in real property, [2] including the beneficial use thereof, [3] the value of which is substantially equal to the value of the fee interest.' " The task force recommended that this definition should control all transfers, both foreseen and unforeseen. (*Pacific Southwest, supra*, 1 Cal.4th at p. 162.) The task force also recommended the creation of " 'statutory "examples" to elaborate on common transactions. . . .' " (*Id.* at p. 161.) Accordingly, the Legislature identified common types of transfers and categorized them. Those transfers constituting a change in ownership are identified in section 61, and those not constituting a change in ownership are identified in section 62. (*Pacific Southwest*, at p. 161.) The present situation does not fall within any of the examples in section 61 or 62. Accordingly, we must consider whether the current transfer meets section 60's change-of-ownership test.

Plaintiff contends the transfer at issue was not a change in ownership under section 60 because none of the three prongs have been met. We disagree.

As to the first prong—present interest—plaintiff notes the Assessor separately appraised and assessed the land and improvements of the property, with the value of the improvements constituting almost one-half of the assessments. Plaintiff contends the income beneficiaries do not have a present interest in the improvements and, accordingly, the assessor was not entitled to reassess them. Plaintiff notes that the lease requires the lessee to construct the improvements on the property, and asserts the lessee, not the lessor, holds the present interest in the improvements.

*Auerbach v. Assessment Appeals Bd. No. 1* (2006) 39 Cal.4th 153 [45 Cal.Rptr.3d 774, 137 P.3d 951] (*Auerbach*), is instructive. There, a retailer leased property owned by a trust. The lease required the retailer at its own expense to either renovate the existing building, or demolish it and construct a new one, but required the trust's approval before undertaking the improvements. The lease provided that the retailer owned the alterations or new improvements during the lease term, but the retailer agreed to turn over all improvements on the property in good condition to the trust at the conclusion of the lease. The lease required the retailer to repair any damage to the property at its expense, but required the lessor to make any insurance proceeds available to the retailer for the repairs. Although the lease was silent

---

[3] We grant plaintiff's request for judicial notice.

on the issue, the evidence established that the retailer paid rent for the land, not the building on it. The retailer elected to demolish the existing building, and constructed a new one.

When the beneficiaries in *Auerbach* received their interests in the trust, they applied for the $1 million grandparent-grandchild reassessment exclusion under section 63.1. Although the assessor granted the exclusion, he concluded the trusts owned the building as well as the land for property tax purposes, and applied the exclusion to both, allocating 92 percent of the exclusion to the building and 8 percent to the land. The trustee challenged this allocation, contending the trust owned only the land, not the building, and therefore the exclusion applied only to the land. The California Supreme Court agreed with the assessor, concluding the trust held a present interest in both the land and the building. The court noted that despite the lease's statement that the retailer owned the building, the provision requiring surrender of the building at the conclusion of the lease demonstrated that the trust held the fee interest in the building. (*Auerbach, supra*, 39 Cal.4th at p. 162.)

Here, as in *Auerbach*, the lease requires the lessee to surrender the improvements to the lessor in good condition when the lease concludes. This suggests the trust's income beneficiaries hold a present interest in the property's improvements. Plaintiff contends, however, the present situation is distinguishable from *Auerbach* because (1) the trust has no right to unilaterally sell the property and improvements, (2) the lessee is entitled to any insurance proceeds if the lessee's improvements are damaged or destroyed, and (3) the lessee is entitled to any compensation paid for the taking of any of the improvements through eminent domain. After reviewing the lease, we conclude none of these matters distinguish the present case from *Auerbach*.

True, nothing in the lease expressly authorizes the trust to sell the property and its improvements, but nothing prevents the trust from doing so either. Indeed, section 12(d) of the lease specifically contemplates the possibility the lessor may sell the property, providing that the lessee shall not be required to pay any taxes assessed "upon the sale, transfer or assignment of the title or estate of the Lessor . . . ." Accordingly, the lack of an express provision authorizing the lessor to sell the entire property does not demonstrate the lessee owns the improvements.

Plaintiff's assertion the lessee is entitled to all of the insurance proceeds if the improvements are damaged or destroyed oversimplifies the issue. The lease's insurance provision requires the lessee to maintain insurance covering 100 percent of the replacement cost of the improvements, and that the lessee must hold any insurance proceeds as *a trust fund* for repairing and rebuilding the improvements. The lessee is required to repair or rebuild damaged or

destroyed improvements on the property at its own expense, except that within two years of lease termination, the lessee may avoid this obligation by assigning the lessor all of the insurance proceeds. The lessee is entitled to keep any remaining insurance proceeds only after all of the improvements have been restored or rebuilt to meet or exceed their value before the loss. Thus, the lease's insurance provisions actually support the Assessor's position that the improvements are owned by the lessor.

Plaintiff's assertion the lessee is entitled to receive all of the compensation from an eminent domain action taking all or part of the improvements is also mistaken. The lease does not give the lessee all the compensation received for the improvements, but only the "unamortized cost" of such improvements. In other words, as the lease term continues, the lessor obtains a greater right to any compensation received from an eminent domain proceeding affecting the improvements. This is consistent with the lease provision stipulating that the lessor is entitled to the improvements at the close of the lease term. Accordingly, we conclude Wilson held a present interest in the property's improvements, which passed to the new income beneficiaries upon his death.

**B.**  *Wilson Had the Beneficial Use of the Property That Was Transferred to the Income Beneficiaries*

Plaintiff asserts the second prong of section 60's test for change in ownership is not met because Wilson never owned legal title to the property. We again disagree.

The question whether income beneficiaries of a trust have the beneficial use of the trust property was squarely addressed in *Reilly, supra,* 142 Cal.App.4th 480, in which the tax assessor reassessed trust-held real property after the income beneficiary died, and a new income beneficiary succeeded to the former's interests. The court noted the " 'principle of trust law that the creation of a trust divides title—placing legal title in the trustee, and *equitable* title in the beneficiaries. [Citations.]' " (*Id.* at p. 489.) After review of the task force report, the court concluded that section 60's "focus is on the person or entity that enjoys the benefits of the property, not upon the fiduciary that holds title to property for the benefit of another." (*Reilly,* at p. 495.) The *Reilly* court noted the California Supreme Court in *Pacific Southwest* recognized "that a landlord who owned commercial property 'exercise[d] its beneficial interest by exacting rent from [the tenant] rather than acquiring physical control of the demised premises . . . .' " (*Reilly,* at p. 495, quoting *Pacific Southwest, supra,* 1 Cal.4th at p. 164.) Accordingly, *Reilly* concluded that "[t]he receipt of income generated by property qualifies as a 'beneficial use' of the property . . . ." (*Reilly,* at p. 495.)

Arguing that the beneficial use prong requires the holder of the interest to also hold legal title to the property, plaintiff cites the Assessment Appeals Manual of the California State Board of Equalization (manual), which addresses the "beneficial use" requirement as follows: "The *beneficial use* element requires the transfer must convey both legal and beneficial interests in the property." He also cites the following observation by the California Supreme Court in *Pacific Southwest*: "The second prong of section 60 requires that to constitute a change in ownership there must be a transfer not only of bare legal title but also of the transferor's beneficial or equitable interest in the land." (*Pacific Southwest, supra*, 1 Cal.4th at p. 163.) Plaintiff has taken these statements out of context.

Specifically, the manual and the Supreme Court in *Pacific Southwest* were addressing the situation where a person conveys bare legal title, but retains a beneficial interest in the property. On this point, the task force report noted: " 'Revocable living trusts are merely a substitute for a will. The gifts over to persons other than the trustor are contingent; the trust can be revoked or those beneficiaries may predecease the trustor. . . . [¶] If the trust is revocable it is excluded because the rights conferred are contingent. If the trustor is the sole beneficiary during his lifetime, his retained interest is considered to be "substantially equivalent in value" to the fee interest in any real property covered by the trust. He is therefore the true owner and the change in ownership does not occur *until* the property passes to the remaindermen on the trustor's death.' " (*Reilly, supra*, 142 Cal.App.4th at pp. 488–489, original italics.)

The present situation is different from the foregoing example because nothing was retained by Wilson when the new beneficiaries received their interests. Neither the manual nor *Pacific Southwest* touched on the situation where income from real property is passed on to new trust beneficiaries. We agree with the court's conclusion in *Reilly*, and hold that by receiving rent from the property as a beneficiary, Wilson had a beneficial use of the property, which passed to his successor beneficiaries on his death.

C.  *The Value of a Lifetime Interest in Income Is Substantially Equal to the Value of a Fee Interest*

Plaintiff contends the third prong of section 60's change of ownership requirements, the value equivalency test, was not met because the value of Wilson's lifetime interest in income was not substantially equal to the value of a fee interest. The contention is not persuasive.

■ Again, *Reilly* addressed this issue and held that a trust beneficiary's lifetime interest in income from trust-held real property meets the value

equivalency prong of section 60. (*Reilly, supra*, 142 Cal.App.4th at p. 498.) In reaching its decision, *Reilly* relied in part on *Leckie v. County of Orange* (1998) 65 Cal.App.4th 334 [76 Cal.Rptr.2d 426] (*Leckie*), in which our division held that the transfer of a life estate in real property, where the grantor retained no interest in the property, constituted a change of ownership.

Here, plaintiff does not directly argue our division's decision in *Leckie* is incorrect, but nonetheless challenges its basic holding citing, as support, portions of the Supreme Court's decision in *Pacific Southwest*. There, the plaintiff sold an office building complex and simultaneously acquired from the buyer a leaseback in one building for 60 years 21 months, which covered 73 percent of the property. The assessor viewed the sale and leaseback as a change of ownership and reassessed the entire parcel. The Supreme Court rejected the plaintiff's claim that the transaction satisfied none of section 60's three prongs. Regarding the value equivalence prong, the Supreme Court explained: "Because [the purchaser] acquired the entire fee, not only did the value of the interest transferred 'substantially equal . . . the value of the fee interest,' it was of identical value because it was a transfer of the fee itself. [Citation.] The property sold essentially for the market price, and plaintiff is now paying rent at the market rate. There is no indication that the property would resell for less than the market price. Hence, notwithstanding the reservation of an encumbrance in the form of an estate for years, the value of the transfer equaled that of a conveyance of fee simple." (*Pacific Southwest, supra*, 1 Cal.4th at p. 164.)

The Supreme Court then contrasted the situation in its case with the transfer of a life estate in which the grantor retained a reversionary interest. The court noted that such a transfer would not meet the value equivalency test "because the value of each divided interest in the estate would not approach that of a fee. A purchaser of the reserved estate would be buying a life estate *per autre vie*—a freehold estate, to be sure, but an estate of questionable value because subject to complete defeasance at an unknown time. Rare is the mortgagee willing to lend on the security of an estate so ephemeral." (*Pacific Southwest, supra*, 1 Cal.4th at p. 165, original italics.)

Our division in *Leckie* acknowledged the Supreme Court's comments regarding the value of a life estate, but noted that the Supreme Court's "comments were made, as dicta, in a discussion of a *retained* life estate, which is clearly exempt from the change of ownership provisions." (*Leckie*, 65 Cal.App.4th at p. 340, original italics.) The Court of Appeal in *Reilly* further distinguished *Pacific Southwest*, as follows: "The court noted in dicta that a purchaser of a retained life estate limited to the grantor's life would have 'an estate of questionable value' because it would be subject to defeasance at an

unknown time. [Citation.] Upon the grantor's death, the purchaser's interest would disappear and the purchaser would retain nothing of value. Here, by contrast, [the income beneficiary]'s interest in the trust property was measured by his own lifetime and not someone else's. The fact the trustee could sell the property during the term of the trust does not render [the income beneficiary]'s interest of questionable value, because he still would have a right to the income from the sale proceeds for the rest of his life." (*Reilly, supra*, 142 Cal.App.4th at p. 498.)

■ The distinction between the conveyance of a life estate in which the grantor retains the remainder and the conveyance of a life estate without any reservation becomes clearer when recognizing the purpose of the value equivalence test. The task force report viewed the value equivalence prong as " 'necessary to determine who is the *primary owner* of the property at any given time. . . . [¶] A major purpose of this third element . . . is to avoid . . . unwarranted complexity by identifying *the primary owner*, so that only a transfer by him will be a change in ownership and when it occurs the whole property will be reappraised. . . .' " (*Leckie*, 65 Cal.App.4th at p. 338, first & second italics added.) By focusing on the primary owner, the assessor is not burdened with separately assessing different estates within the same property, such as having to reassess a transferred life estate separately from the remainder interest. The task force's "treatment of life estates was focused on those retained by the transferor, such as when a parent transfers the family home to his children, but retains the right to live there during his life. [Citation.] The task force explained, 'Transfers with a retained life estate are not ownership changes until the life tenant dies. *The life tenant has the dominant or primary interest under the "value equivalence" element of the general change in ownership definition*, and there is no transfer of the *present interest* in the property until the life tenant dies and the property vests in the remainder.' " (*Leckie*, at p. 338, first italics added.) Accordingly, the task force report expressly considered a life estate sufficiently equal in value to a fee interest to meet the change-of-ownership test.

■ Moreover, as our division previously recognized in *Leckie*, property tax rule 462.060(a), promulgated by. the Board of Equalization, provides: "The creation of a life estate in real property is a change in ownership at the time of transfer unless the instrument creating the life estate reserves such estate in the transferor or the transferor's spouse." (Cal. Code Regs., tit. 18, § 462.060, subd. (a).) This rule was adopted in August 1979 contemporaneously with section 60. "[A] contemporary administrative construction of a statute by the agency charged with its enforcement and interpretation, 'is entitled to great weight unless it is clearly erroneous or unauthorized.' " (*International Business Machines v. State Bd. of Equalization* (1980) 26 Cal.3d 923, 930–931 [163 Cal.Rptr. 782, 609 P.2d 1].) Accordingly, we perceive no reason to depart from our division's previous decision in *Leckie*.

Plaintiff also contends, however, that even if a life estate is substantially equal to a fee interest under the third prong of section 60, Wilson's interest had less value than a life estate because his interest was defeasible. Specifically, under the trust instrument, an income beneficiary's interest would lapse upon that beneficiary's attempt at assignment, mortgage or hypothecation of his or her interest, or attempt to attack or contest any provision of the trust. Plaintiff reasons, "The more or less probability that such an interest would be lost would merely affect the marketplace's estimate of its value."

Each of the conditions Phelps cited that may defeat the beneficiaries' interest in receiving income from the trust is completely under the beneficiaries' control. Accordingly, we believe the effect on the value of the beneficiaries' interests would not be sufficient to affect the operation of the value equivalency test under section 60.

Plaintiff also makes a purported appeal to "logic and common sense" by comparing the value of his annual income from the property, $77,548, with the value of the property, $27,740,000, and asking the court if these two values are equal. Of course, this is not a fair comparison because the fair market value of a property is virtually always a multiple of the income derived from it, and the $77,548 figure is only one-third of the income received from the property. The transfer of Wilson's one-third interest in the property did not result in a reassessment of the entire property, but only the third of it in which he had held an income interest. (See § 65.1 ["when an interest in a portion of real property is purchased or changes ownership, only the interest or portion transferred shall be reappraised"].)

Plaintiff asserts the trust receives no income from the restaurant and retail pads that were subleased by the property's lessee, and therefore the assessor should not have reassessed the parcels containing those pads. We disagree. Although the trust received no direct rent from those parcels, the parcels are part of the master lease from which it does derive income.

D.    Steinhart v. County of Los Angeles *(2010) 47 Cal.4th 1298 [104 Cal.Rptr.3d 195, 223 P.3d 57]*

After we filed our original opinion affirming the trial court's denial of plaintiff's petition, the Supreme Court granted review and subsequently transferred the case to us for reconsideration in light of *Steinhart, supra,* 47 Cal.4th 1298. We have received and reviewed supplemental briefing addressing the case (Cal. Rules of Court, rule 8.200),[4] and find no basis to overturn the trial court's judgment.

---

[4] We have received an application to file an amicus curiae brief and a request for judicial notice from Dibby Allan Green. Defendant and real party in interest opposes the application on the ground it is untimely under California Rules of Court, rule 8.200(c). No specific rule

In *Steinhart*, a trust settlor transferred her residence to a revocable living trust. She was the sole present beneficiary of the revocable trust, and the trust document provided that upon her death, the trust became irrevocable and her sister had the right to occupy the residence during her lifetime with the remainder to their siblings and issue. (*Steinhart, supra*, 47 Cal.4th at p. 1303.) The court concluded a change of ownership occurred upon the settlor's death because her equitable and beneficial interest in the real property passed to the sister and the siblings.

Consistent with our analysis in part B. above, the Supreme Court in *Steinhart* concluded trust beneficiaries hold " 'an equitable estate or beneficial interest in' property held in trust and are ' "regarded as the real owner[s] of [that] property." ' " (*Steinhart, supra*, 47 Cal.4th at p. 1319.) *Steinhart* thus confirms our rejection, based on *Reilly, supra*, 142 Cal.App.4th 480, of plaintiff's contention the second prong of section 60's test for change in ownership was not met because Wilson never owned legal title to the property.

Plaintiff argues that in deciding whether a change in ownership has occurred, *Steinhart* requires the "court [to] look solely at what the transferor conveys." Plaintiff asserts "all vested interests (possessory or remainder) in the Phelps Trust were transferred when John Wilson Phelps died in 1947" and that "nothing" was transferred "when Wilson died in 2002 and his children received the right to [his] one-third life interest income per the terms of the Phelps Trust . . . because the transfer and the vesting of the property interests of Wilson's children in the Trust occurred in 1947." He asserts "there was no new transfer by Wilson in 2002 because the entire equitable interest in the trust property was necessarily transferred" in 1947 and "[a]lthough Wilson's children's heretofore future interest became possessory in 2002, the property rights were transferred to them from John Wilson Phelps in 1947 and were vested then." He says, "Simply, John Wilson Phelps was the transferor and not Wilson. Under *Steinhart*, there is no assessable change in ownership."

We disagree. Although a change in ownership occurred in 1947, another ownership change occurred in 2002, when Wilson's entire equitable interest in the real property passed to Wilson's children. Plaintiff's focus on identifying a single "transfer" or transferor finds no support in *Steinhart*. Proposition 13 tracks real ownership of real property, which *Steinhart* determined follows the equitable estate. In 2002, Wilson no longer " 'continued to own the property.' " (*Steinhart, supra*, 47 Cal.4th at pp. 1321, 1325, fn. 21

contemplates amicus curiae briefs following transfer of the case from the Supreme Court. (Cf. rules 8.528(f) & 8.200(b) [contemplating supplemental briefs by the parties].) In any event, in the exercise of our discretion we deny the application and request for judicial notice.

[quoting Prop. 13's ballot pamphlet that assessed value could be increased by no more than 2 percent per year " 'as long as the same taxpayer continued to own the property' "].)

Citing Civil Code section 779, plaintiff argues Wilson's death did not result in a transfer of interest in trust property. Civil Code section 779 provides, "When a remainder is limited to the heirs, or heirs of the body, of a person to whom a life estate in the same property is given, the persons who, on the termination of the life estate, are the successors or heirs of the body of the owner for life, are entitled to take by virtue of the remainder so limited to them, and not as mere successors of the owner for life." Civil Code section 779 abolished in California the rule in *Shelley's Case* (1581) 76 Eng.Rep. 206. The rule provided that where an estate was conveyed or devised to a person for life, with the remainder to his heirs, the person received the fee and could transfer the estate and defeat the heirs' expectancy. (12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 11, p. 60.) We see nothing in Civil Code section 779 supporting plaintiff's argument no change of ownership occurred in 2002.

■ Plaintiff notes that under section 61, subdivision (g), a change of ownership includes, "Any vesting of the right to possession or enjoyment of a remainder or reversionary interest that occurs upon the termination of a life estate or other similar precedent property interest, except as provided in subdivision (d) of Section 62 and in Section 63." He observes the section "appears to state that every time a life estate ends and the remainder interest vests in another, this is an assessable change in ownership." He contends *Steinhart* limits section 61, subdivision (g), to retained life estates and nonsuccessive remainder interests. *Steinhart* did not involve successive transfers or vesting of remainder interests under a trust, and the court did not discuss section 61, subdivision (g), in this context. (See *Steinhart, supra*, 47 Cal.4th at pp. 1323–1324 & fn. 18; see also *id.* at 1325, fn. 22 ["[w]hether a change in ownership would occur should either Steinhart or any of her siblings transfer their interest in the residence is beyond the scope of this case"].) Cases are not authority for propositions not considered. (*Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 127 [92 Cal.Rptr.3d 595, 205 P.3d 1047].) Section 61, subdivision (g), however, supports our conclusion the vesting of property rights in Wilson's children upon termination of Wilson's life interest effected a change of ownership.

Plaintiff repeats his contention, rejected in part C. above, that even if a transfer of property occurred when Wilson died in 2002, the transferred interest was not substantially equal to the fee and fails under the third prong of section 60. As explained above, *Reilly* addressed this issue, and held a trust beneficiary's lifetime interest in income from trust-held real property meets

the value equivalency prong of section 60. *Steinhart* did not disapprove *Reilly* or *Leckie*. (See *Steinhart, supra,* 47 Cal.4th at p. 1306 [noting Court of Appeal in *Steinhart* had disagreed with *Leckie*].) As noted above, the value equivalence prong is necessary to determine who the primary owner of the property is at any given time. (See *Leckie,* 65 Cal.App.4th at p. 338.) Nothing in *Steinhart* affects our analysis of this issue in part C.

■ We conclude the transfer of Wilson's interest as a trust beneficiary to the current beneficiaries constituted a change of ownership under section 60. Accordingly, we do not disturb the trial court's ruling denying plaintiff's request for writ of mandate.

## IV

### DISPOSITION

The judgment is affirmed. Respondent is entitled to its costs on appeal.

Rylaarsdam, Acting P. J., and Moore, J., concurred.

A petition for a rehearing was denied September 15, 2010, and appellant's petition for review by the Supreme Court was denied December 1, 2010, S186765. Kennard, J., did not participate therein.