**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CITY OF LOS ANGELES,
    *Plaintiff/Counter-Defendant/*
                    *Appellant,*

v.

SAN PEDRO BOAT WORKS, a
California corporation,
                    *Defendant,*

and

BCI COCA-COLA BOTTLING
COMPANY OF LOS ANGELES, a
Delaware corporation,
    *Defendant/Counter-Claimant/*
                    *Appellee.*

No. 08-56163

D.C. No.
2:02-cv-07986-
ABC-JWJ

OPINION

Appeal from the United States District Court
for the the Central District of California
Audrey B. Collins, Chief District Judge, Presiding

Argued and Submitted
November 2, 2009—Pasadena, California

Filed March 14, 2011

Before: Ronald M. Gould and Carlos T. Bea, Circuit Judges,
and Donald W. Molloy,* District Judge.

Opinion by Judge Bea

*The Honorable Donald W. Molloy, United States District Judge for the
District of Montana, sitting by designation.

3501

## COUNSEL

Rockard J. Delgadillo, Thomas A. Russell, Kenneth F. Matt-feld, San Pedro, California, for the plaintiff-appellant.

William F. Sullivan, Matthew J. Sanders, D. Scott Carlton, Los Angeles, California; Stephen D. Kinnaird, Washington, D.C., for the defendant-appellee.

# OPINION

BEA, Circuit Judge:

This case calls on us to determine, in the first instance, whether the holder of a revocable permit to use real property is an "owner" of that real property for purposes of imposing liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") for the clean-up of hazardous substances disposed on that property by others. A common sense reading of the statute and existing state law persuade us that this permittee, as the holder of a possessory interest, cannot be such an "owner" under CERCLA, and we so hold.

The City of Los Angeles ("the City") appeals from the district court's grant of partial summary judgment in favor of BCI Coca-Cola Bottling Company of Los Angeles ("BCI Coca-Cola"). The City sued BCI Coca-Cola on ten counts arising from environmental contamination caused by operation of the San Pedro Boat Works located at Berth 44 in the Port of Los Angeles ("Berth 44"). The City seeks reimbursement for the expense of cleaning up hazardous substances disposed of at Berth 44. The parties do not dispute whether hazardous substances were released at Berth 44; they were. The disagreement is over who should pay the clean-up costs.

Under CERCLA, BCI Coca-Cola must pay if and only if it or its predecessor-in-interest—Pacific American[1]—was an "owner or operator" of the boatworks when the hazardous

---

[1]BCI Coca-Cola bought all of Pacific American's assets and assumed all of its liabilities in 1993. Hence, if Pacific American were liable under the law—including liability as an "owner" under CERCLA—BCI Coca-Cola would be so liable. The alleged disposal of hazardous substances occurred during Pacific American's tenure as permittee, so although BCI Coca-Cola is the named defendant for purposes of this appeal, all the relevant actions or omissions were those of its predecessor-in-interest, Pacific American.

substances were disposed at Berth 44. *See* CERCLA, 42 U.S.C. §§ 9601-9675 (2006).[2] In a separate decision, the district court held that Pacific American, and thus BCI Coca-Cola, was not an "operator" of the boatworks at Berth 44. The City, for reasons unexplained by the record, did not appeal the district court's ruling on "operator" liability. We therefore focus our analysis on the district court's determination that Pacific American, and thus BCI Coca-Cola, was not an owner of the boatworks for purposes of CERCLA.

Because the definitions Congress provides in CERCLA for "owners" and "operators" are mere tautologies,[3] this court has looked to the common law—including the state law of the property's location—for guidance in other cases when imposing CERCLA liability on possessors and owners of various property interests. *See Burlington N. & Santa Fe Ry. Co. v. United States*, 129 S. Ct. 1870, 1881 (2009) ("Congress intended the scope of liability to 'be determined from traditional and evolving principles of common law.' ") (quoting *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 808 (S.D. Ohio 1983); *Long Beach Unified Sch. Dist. v. Dorothy B. Godwin Cal. Living Trust*, 32 F.3d 1364, 1368 (9th Cir. 1994) (looking to the common law, including California common law, to determine whether an easement holder is an "owner" under CERCLA). Under California law, the holder of a revocable permit, like the easement holder in *Long Beach*, has only a possessory interest in the real property governed by the permit, an interest "which exists as a result of

---

[2] CERCLA imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility." 42 U.S.C. § 9607(a)(2). "The remedy that Congress felt it needed in CERCLA is sweeping: *everyone* who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of [the environmental] cleanup." *United States v. Bestfoods*, 524 U.S. 51, 56 n.1 (1998) (quoting *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 21 (1989) (plurality opinion of Brennan, J.)).

[3] Congress defines the term "owner and operator" to mean: "any person owning or operating [a] facility." 42 U.S.C. § 9601(20)(A)(ii).

possession, exclusive use, or a right to possession or exclusive use of land *unaccompanied by the ownership of a fee simple or life estate in the property.*" *Bd. of Supervisors v. Archer*, 96 Cal. Rptr. 379, 386 (Cal. App. 1971) (emphasis added). Given this common law distinction between ownership interests and possessory interests, and the juxtaposition of "owner" and "operator" in CERCLA—where "operator" liability has been construed expansively in this circuit and others—we conclude that Congress intended to give "owner" its common law meaning. We here hold that "owner" liability under CER-CLA does not extend to holders of mere possessory interests in land, such as permittees, easement holders, or licensees, whose possessory interests have been conveyed to them by the owners of real property, which owners continued to retain power to control the permittee's use of the real property.

In conjunction with the more permissive "operator" liability, this narrow construction of "owner" liability furthers Congress's intent to hold liable both the passive fee title owner of real property who pollutes or acquiesces in another's discharge of harmful pollutants on his land, and the active (or negligent) operator of the facility who has only a possessory interest in the owner's real property. Under this construction, and in accordance with California common law, BCI Coca-Cola—as a permittee, subject to restrictions imposed by the landowner, City of Los Angeles, on BCI Coca-Cola's predecessor-in-interest—is not liable as an owner under CER-CLA.

Further, the district court did not err in granting summary judgment to BCI Coca-Cola on the City's nuisance claims because the City did not raise a triable issue of fact that Pacific American ever had knowledge, or was put on notice, of the environmental contamination. Nor did the district court err in denying the City leave to amend its complaint to add a breach of contract claim against Pacific American. Therefore, we affirm.

## I.   Factual Background

Berth 44 is located within the Port of Los Angeles, which is itself part of the Los Angeles Harbor. It is owned by the City of Los Angeles and run by the Board of Harbor Commissioners. The Board of Harbor Commissioners "have the management, supervision and control . . . of all navigable waters and all tidelands and submerged lands . . . at Los Angeles Harbor." Charter of the City of Los Angeles ("Charter"), Art. XI § 138. The Board of Harbor Commissioners is responsible for issuing franchises, permits, and leases for use of the land at the Los Angeles Harbor. Charter, Art. XI § 140(c)-(d).

In 1965, the Board of Harbor Commissioners issued Revocable Permit 936 to the Los Angeles Harbor Marine Corporation ("L.A. Harbor Marine"), for the limited purpose of operating a boatworks—a facility for the repair, maintenance, and rebuilding of ships and boats—on Berth 44. The permit granted possession of roughly 3 acres of land and 1.6 acres of water at Berth 44. From 1965 to 1969, L.A. Harbor Marine operated a boatworks at Berth 44. During this time, Pacific American began negotiations with L.A. Harbor Marine to purchase the permit. While those negotiations were ongoing, Pacific American incorporated San Pedro Boat Works; it became a wholly owned subsidiary corporation of Pacific American. Pacific American and L.A. Harbor Marine agreed on the terms of the sale, and with the City's necessary and prior approval, Pacific American purchased the permit in an asset sale that closed in August 1969.

In the close of the 1969 asset sale, Pacific American conveyed all of its interest in L.A. Harbor Marine's physical assets, not including Revocable Permit 936, to its wholly-owned subsidiary corporation, San Pedro Boat Works so that at no time did Pacific American ever own the boatworks assets. At closing, San Pedro Boat Works became the sole owner of the facilities and machinery at Berth 44.

Nevertheless, Pacific American's efforts to make San Pedro Boat Works wholly responsible for all things related to the boatworks on Berth 44 were not immediately successful. On August 4, 1969, Pacific American, not San Pedro Boat Works, accepted an assignment of Revocable Permit 936 from L.A. Harbor Marine. In April or May of 1970, Pacific American—not San Pedro Boat Works—obtained Revocable Permit 1076 from the Board of Harbor Commissioners to replace Revocable Permit 936. Not until June 1970 did Pacific American rid itself of its last direct connection to Berth 44 by assigning Revocable Permit 1076 to San Pedro Boat Works, which assignment was approved by the Board of Harbor Commissioners. Thus, Pacific American was the named permittee of Revocable Permits 936 and 1076 for operation of the boatworks for approximately ten months. The parties do not contest, however, that only San Pedro Boat Works operated the boatworks facility at all times, including during those ten months.

In 1974, Martin Vincent purchased the facilities and machinery of the San Pedro Boat Works. Although Pacific American remained the named permittee on Revocable Permit 1076, Vincent assumed San Pedro Boat Works's role as assignee of the permit upon his purchase of San Pedro Boat Works. In 1983, Vincent sold the assets of San Pedro Boat Works to Billfish, Incorporated, and Revocable Permit 1076 was assigned to Billfish. Subsequently, the City and Billfish entered into Revocable Permit 1737, replacing Revocable Permit 1076. In 1993, BCI Coca-Cola purchased Pacific American, including Pacific American's remaining assets and its liabilities. BCI Coca-Cola does not dispute that it acquired all of Pacific American's liabilities, and therefore stands in the shoes of Pacific American for the purposes of this case.

In 1995, the City first began to investigate the soil and groundwater at Berth 44. A variety of contaminants were discovered, including volatile organic compounds, petroleum hydrocarbons, polychlorinated biphenyls, polycyclic aromatic

hydrocarbons, copper, lead, mercury, and chromium. In 2002 and 2003, subsea sediment samples collected by the City from the area surrounding Berth 44 revealed particularly high levels of copper and zinc. The City removed the contaminated sediments from the area in 2003 by dredging, which reduced contaminant concentrations to levels acceptable to a multi-agency Contaminated Sediments Task Force.

The City filed its initial complaint against BCI Coca-Cola, Pacific American, and San Pedro Boat Works,[4] among others, on October 15, 2002, alleging the defendants were responsible for contamination of the soil, groundwater, and sediments at and around Berth 44, and thus were liable for the cleanup costs. In its Fourth Amended Complaint, the City alleged twelve claims against eight named defendants for site pollution at Berth 44. Relevant to this appeal, the City alleged three claims against BCI Coca-Cola under CERCLA, as well as claims for private and public nuisance under state law. The City also moved to add a claim for breach of contract in its Fourth Amended Complaint, but the district court denied this motion.

In its Fourth Amended Complaint, the City advanced four theories of CERCLA liability against BCI Coca-Cola based on Pacific American's relationship with Berth 44: The City alleged (1) Pacific American was a CERCLA "owner" because it held title to assets used at Berth 44, (2) Pacific American was a CERCLA "owner" because it held Revocable Permits from the City to do business at Berth 44, (3) Pacific American was derivatively liable as an "operator" because San Pedro Boat Works—Pacific American's wholly-owned subsidiary—was its alter-ego and San Pedro Boat Works was liable as an "operator" of the boatworks at Berth 44, and (4) Pacific American was itself an "operator" of the boatworks business at Berth 44.

---

[4]Defendant San Pedro Boat Works filed for bankruptcy protection in December 2002.

The City moved for summary adjudication of its CERCLA claims against BCI Coca-Cola, and on July 10, 2007, the district court held: (1) there was a genuine issue of fact as to whether Pacific American held title to assets used at Berth 44, (2) the Revocable Permits were insufficient to establish owner liability of Pacific American, and thus of BCI Coca-Cola as successor-in-interest, under CERCLA, (3) Pacific American could not be held derivatively liable for San Pedro Boat Works's ownership or operation of the boatyard business at Berth 44 because San Pedro Boat Works was not the alter-ego of Pacific American, and (4) Pacific American was not an "operator" of the boatworks under CERCLA. The district court submitted to a jury the first question—whether Pacific American owned the assets of the boatyard business at Berth 44—without specific instruction as to the definition of "ownership." The jury returned a special verdict that Pacific American did not own the assets of the boatworks. The district court then sua sponte dismissed the City's CERCLA claims.

The district court next granted BCI Coca-Cola's motion for summary judgment on the City's state-law claims. The district court dismissed the City's nuisance claims on the ground that the City failed to raise a triable issue of fact as to whether Pacific American—BCI Coca-Cola's predecessor, whose liabilities became BCI Coca-Cola's—had knowledge or notice of the environmental contamination.

The district court entered final judgment in favor of BCI Coca-Cola, holding that all of the City's claims were premised on the theory that BCI Coca-Cola was liable as a successor-in-interest to Pacific American, but the jury had determined Pacific American never owned any of the assets of the boatworks. In fact, all of the physical assets of the boatworks were owned by the San Pedro Boat Works, before being acquired by C. Martin Vincent in 1974. Thus, BCI Coca-Cola's ownership of Pacific American did not vest any ownership of the boatworks' assets in BCI Coca-Cola. The City appeals on the ground that because Pacific American

held the revocable permit to operate the boatworks at Berth 44 for ten months in 1969-70, Pacific American was an owner of the boatworks for purposes of CERCLA liability. The City also appeals the district court's denial of the City's motion for leave to amend its complaint to add a breach of contract claim against Pacific American.

We review de novo the district court's grant or denial of summary judgment. *Kendall-Jackson Winery, Ltd., v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046 (9th Cir. 1998). We review the district court's denial of a motion for leave to amend a complaint for abuse of discretion. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987).

## II. CERCLA Claims

The City contends on appeal that BCI Coca-Cola is liable for the clean-up of the Berth 44 boatworks because Pacific American possessed Revocable Permits from the City for ten months from 1969 to 1970, and was thus an "owner" of the physical assets of the Berth 44 boatworks when the pollution was discharged, and BCI Coca-Cola assumed Pacific American's CERCLA "owner" liability in the 1993 asset-liabilities purchase.

**[1]** "CERCLA imposes the costs of the [environmental] cleanup on those responsible for the contamination." *Best-foods*, 524 U.S. at 56 n.1 (quoting *Union Gas*, 491 U.S. at 7). "The remedy that Congress felt it needed in CERCLA is sweeping: *everyone* who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup." *Id.*

Our court construes CERCLA liberally to effectuate the statute's two primary goals: "(1) to ensure the prompt and effective cleanup of waste disposal sites, and (2) to assure that parties responsible for hazardous substances [bear] the cost of remedying the conditions they created. *Carson Harbor Vil-*

*lage, Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001) (internal alterations omitted). However, in enacting CERCLA, Congress did not "intend[ ] to impose liability on everyone else who has any interest at all in land containing a toxic waste facility." *Long Beach*, 32 F.3d at 1369. Therefore, "we have cautioned that 'we must reject a construction that the statute on its face does not permit, and the legislative history does not support.' " *Carson*, 270 F.3d at 881 (quoting *3550 Stevens Creek Assoc. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1363 (9th Cir. 1990)).

**[2]** CERCLA imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2).[5] As a successor-in-interest to Pacific American, BCI Coca-Cola is liable under CERCLA if Pacific American was an owner of the boatworks facility.

**[3]** Congress did not clearly define the word "owner" in CERCLA. Instead, Congress defined the terms "owner and operator," to mean "in the case of an onshore facility or an offshore facility, any person owning or operating such facility." 42 U.S.C. § 9601(20)(A)(ii). In short, an "owner" is "any person owning a facility." The Supreme Court has recognized that this definition is entirely tautological, and thus useless. *Bestfoods*, 524 U.S. at 66.

Our court has examined the meaning of the term "owner" under CERCLA in just one case. *See Long Beach*, 32 F.3d at

---

[5]"The term 'facility' means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." 42 U.S.C. § 9601(9). The parties do not dispute that the boatworks at Berth 44 is such a facility.

1365. In *Long Beach*, the School District bought land from the Godwin Trust. The Godwin Trust had previously leased the land to the Schafer Brothers Transfer and Piano Moving Company ("Schafer"), which maintained a waste pit on the land. The School District sued the Godwin Trust and Schafer, both of which settled, and also Mobil Oil and Powerine Oil ("M & P"), which did not. The School District alleged M & P were liable under CERCLA as owners or operators because M & P held an easement to run a (non-polluting) pipeline across the land. The pipeline had no connection to the targeted waste pit. The district court granted M & P's motion to dismiss. *Id.* at 1366. We affirmed, holding that an easement for a non-polluting pipeline was not sufficient to show M & P were operators or owners under CERCLA. *Id.* at 1370. "Having an easement does not make one an 'owner' for purposes of CERCLA liability." *Id.*

First, we noted that because CERCLA did not provide a definition of "owner," we should read the statute as "incorporating the common law definitions of its terms." *Id.* at 1368. Looking to California law, we found a number of state law cases distinguishing easements—which convey only rights of and from *another* in or over the land—from ownership. *Id.* at 1368. *See, e.g., City of Hayward v. Mohr*, 325 P.2d 209, 212 (Cal. App. 1958) (holding that although an easement is an "interest" in land, it is only "a limited use or enjoyment of the land in which the interest exists . . . it is not itself either land or an estate in land"); *Robinson v. Cuneo*, 290 P.2d 656, 658 (Cal. App. 1955) (holding that an easement holder, unlike an owner, "owns no part of the land itself and has no right to exclude the owner from the use of any of the land"). From these state law cases, we determined that the common law definition of "owner" did not include an easement holder, and therefore, extending CERCLA owner liability to M & P was unwarranted. *Long Beach*, 32 F.3d at 1370.

**[4]** *Long Beach* establishes the rule that this court should look to the common law—including the law of the state where

the land at issue is located—in determining whether a party was an "owner" for purposes of CERCLA liability. *Id.* at 1368. Although the holding in *Long Beach* with regard to easement holders is not conclusive of the issue in this case, the case demonstrates that there is a relevant distinction, for purposes of CERCLA owner liability, between absolute title ownership to real property and less-than fee-title possessory interests in real property, conveyed by the holder of fee title.

However, not all courts have followed *Long Beach*'s methodology of looking to the common law to determine whether a given holder of a property interest is an owner under CERCLA. Some district courts have determined CERCLA ownership liability by examining whether the holder of that interest (typically a lessee) possessed "site control" over the facility. *See United States v. South Carolina Recycling & Disposal, Inc.*, 653 F. Supp. 984 (D.S.C. 1986), *aff'd in part, vac'd in part sub nom. United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir. 1988).

In *South Carolina Recycling*, the district court of South Carolina held that a lessee could be an owner under CERCLA.[6] *Id.* at 999. There, the president of the lessee negotiated a verbal lease with the owners to use the site to store raw chemicals. Individuals associated with the lessee began storing waste at the site, but did not do so as employees of the lessee. Eventually, these individuals formed a new corporation to manage the waste operations. That entity assumed the lease two years after the verbal lease was formed. The entity continued to store hazardous waste on the property for six more

---

[6]District courts from several circuits have followed *South Carolina Recycling*'s reasoning and evaluated the degree of site control in deciding whether to impose owner liability on lessees. *See, e.g.*, *Delaney v. Town of Carmel*, 55 F. Supp. 2d 237, 258-59 (S.D.N.Y. 1999); *Castlerock Estates, Inc. v. Estate of Markham*, 871 F. Supp. 360, 367 (N.D. Cal. 1994); *Burlington N. R.R. v. Woods Indus., Inc.*, 815 F. Supp. 1384, 1391-92 (E.D. Wash. 1993); *United States v. A & N Cleaners & Launderers, Inc.*, 788 F. Supp. 1317, 1333 (S.D.N.Y. 1992)).

years. The district court held the lessee was liable as an owner under CERCLA because it "maintained control over and responsibility for the use of property and, essentially, stood in the shoes of the property owners." *Id.* at 1003. The court explained that "site control is an important consideration in determining who qualifies as an 'owner' under [CERCLA]." *Id.*

In the only circuit court decision to address the liability of a lessee under CERCLA's owner provision, the Second Circuit held that lessees could be liable as owners only in the rare case where the lessee was a de facto owner, and expanded the site-control test into a five-factor test for determining de facto ownership. *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 330-31 (2d Cir. 2000). In that case, Commander Oil bought two lots. Lot 1 was clean office space; Lot 2 was a polluted petrol depot. Commander Oil leased clean Lot 1 to Barlo Equipment and polluted Lot 2 to Pasley Solvents & Chemicals. A few years later, Commander Oil reorganized the leases, so that it leased both lots to Barlo and Barlo then sublet polluted Lot 2 to Pasley. The local Department of Health discovered the pollution on Lot 2 and ordered Commander Oil to clean that Lot. Commander Oil then sued Barlo and Pasley for contribution under CERCLA. The district court held Barlo was an "owner," by virtue of the consolidated lease, and ordered Barlo to pay one-fourth of the clean up costs. *Id.* at 325-26.

The Second Circuit reversed, holding owner liability applied only to lessees when the lessee was a de facto owner, such as in the case of "the proverbial 99-year lease." *Id.* at 330. The Second Circuit held Barlo "did not possess sufficient attributes of ownership" for owner liability. *Id.* at 331.

*Commander Oil* identified five factors to consider in determining *de facto* ownership:

> (1) whether the lease is for an extensive term and admits of no rights in the owner/lessor to determine

how the property is used; (2) whether the lease cannot be terminated by the owner before it expires by its terms; (3) whether the lessee has the right to sublet all or some of the property without notifying the owner; (4) whether the lessee is responsible for payment of all taxes, assessments, insurance, and operation and maintenance costs; and (5) whether the lessee is responsible for making all structural and other repairs.

*Id.* at 330-31.

**[5]** Instead of applying a nebulous and flexible analytical framework such as "site control" or *Commander Oil*'s five-factor balancing test—tests which do not clearly call out what an investor in land can expect and which factors are themselves susceptible to endless manipulation in litigation—we follow our court's methodology in *Long Beach*. Looking to common law, including California common law, we find that the holder of a permit for specific use of real property is not the "owner" of that real property, where, as here, the fee title owner retained power to control the permittee's use of the real property. Instead, such a permittee holds merely a possessory interest in the land, comparable to the interest of a licensee or easement holder. As the California Court of Appeals has held, a "possessory interest [is] an interest in real property which exists as a result of possession, exclusive use, or a right to possession or exclusive use of land *unaccompanied by the ownership of a fee simple or life estate in the property*," which ownership interest is retained by the fee title owner of the real property. *Archer*, 96 Cal. Rptr. at 386 (emphasis added) (internal quotation marks, alterations, and citations omitted). Such a possessory interest "may be a leasehold interest or the interest of either an easement holder or a mere permittee or licensee," and "may exist as the result of a grant, among others, of a leasehold estate, a profit a prendre, or any other legal or equitable interest *of less than freehold*. *Id* (emphasis added).

**[6]** California state courts have consistently distinguished between possessory interests, such as a revocable permit, and title ownership.[7] As the Supreme Court of California recently reiterated with regard to a lease (which, as the facts of this case show, usually confers greater property interests than does a revocable permit):

> Notwithstanding the fact that a lease is a present possessory interest in land, there is no question that as a nonfreehold estate it is a different species of interest from a freehold estate in fee simple . . . . A leasehold is not an *ownership* interest, unlike the possession of land in fee simple . . . It is for that reason that common parlance refers to the "owner" of a freehold estate, encumbered or unencumbered, but to the "holder" of a lease; the freeholder is seised of land, whereas the leaseholder is not.

*Auerbach v. Assessment Appeals Bd. No. 1.*, 137 P.3d 951, 956 (Cal. 2006)[8] (quoting *Pac. Sw. Realty Co. v. Cnty. of Los*

---

[7]This distinction is frequently discussed in the context of assessing real property taxes. Under California law, ad valorem property taxes may be assessed against owners of real property or against parties with a "possessory interest" in real property, where possessory interest is defined as "[p]ossession of, claim to, or right to the possession of land or improvements that is independent, durable, and exclusive of rights held by others in the property, except when coupled with ownership of the land or improvements in the same person." Cal. Rev. & Tax Code § 107(a).

[8]*Auerbach* raised the question whether the lessee of a retail building was the "owner" of that building for property reassessment purposes. Proposition 13, adopted in 1978, limited the amount that the assessed value of real property could be increased, unless ownership of the property changed hands. *Auerbach*, 137 P.3d at 952. In *Auerbach*, Tommy Hilfiger had a ten-year lease for a retail building on Stanley Anderson's real property. *Id*. When Anderson and his wife died, ownership of the real property transferred into a trust benefitting their grandchildren, and the assessment board moved to increase the assessed value of the property. *Id*. The grandchildren received a $1 million grandparent-grandchild reassessment exclusion, which they tried to apply only toward the increased value of the land,

*Angeles*, 820 P.2d 1046, 1051 (Cal. 1991); *see also Dirs. of Fallbrook Irr. Dist. v. Abila*, 106 Cal. 355, 362 (1895) (" 'Owner,' in its general sense, means one who has full proprietorship in and dominion over property. In Bouvier's Law Dictionary it is said that: 'The word 'owner,' when used alone, imports an absolute owner.' ").

California is not alone in recognizing this distinction; other common law courts have held that a mere possessory interest in the use or enjoyment of real property, such as a permit, does not constitute "ownership." *See, e.g.*, *Peoples Gas, Light, and Coke Co. v. Harrison Cent. Appraisal Dist.*, 270 S.W. 3d 208, 212 (Tex. App. 2008) ("Texas courts have generally defined taxable 'owner' as the individual or entity holding legal title to the property or holding an equitable right to obtain legal title."); *Stansbury v. MDR Dev., L.L.C.*, 871 A.2d 612, 620 (Md. App. 2005) ("[T]he owner of land in fee holds all of the complex elements of a single right, a bundle of sticks, if you will, which include not only the right to use the surface, but so much of the superjacent airspace as he can use, as well as the subjacent reaches below.") (quoting *Macht v. Dep't of Assessments of Baltimore City*, 266 Md. 602, 605 (1972); *Mesa Verde Co. v. Montezuma Cnty. Bd. of Equalization,* 898 P.2d 1, 11 (Colo. 1995) (holding that the United States "owned" the real property at issue, while the permittees and lessees held only a "possessory interest" in the land); *Spanish River Resort Corp. v. Walker*, 497 So. 2d 1299, 1301 (Fla. App. 1986) (holding that an "owner enjoy[s] all of the sticks which constitute the bundle of rights that is fee ownership of real estate") (internal quotation omitted).

---

claiming that they did not own the retail building leased by Hilfiger. *Id.* at 953. In response to this claim, the California Supreme Court affirmed the ruling of the Court of Appeal that Hilfiger, the lessee, was not the owner of the retail building, and thus, the reassessment exclusion must be divided between the increased value of both the land and the retail building. *Id.* at 958.

This interpretation of the term "owner" is particularly appropriate in the context of imposing CERCLA liability. After all, if Congress intended to impose no-fault, no-cause liability on the holder of a mere possessory interest in real property, the least it could do is speak clearly. In establishing "owner" liability, Congress did not say "de facto owner," or "possessor," or "person with some incidents or attributes of ownership," as it has in other legislation. *See* , *e.g.*, 26 U.S.C. § 2042(2) (stating that a life insurance policy can be included in the decedent's gross estate for estate tax purposes as if owned by the decedent, if the decedent possessed "incidents of ownership" in the insurance policy). Instead it used the unmodified term "owner" which, as the Supreme Court of California noted in *Abila*, "when used alone, imports an absolute owner." 106 Cal. at 362 (internal quotations omitted).

**[7]** The logic of this well-recognized distinction between holders of possessory interests, in this case a permittee, and owners is made manifest by the narrow bundle of rights Pacific American in fact enjoyed during its ten-month possession of the revocable permits to operate the Berth 44 boatworks. For example, the two revocable permits possessed by Pacific American in 1969 and 1970 could be terminated by the City, at its pleasure, with thirty and ninety days notice respectively. Pacific American could not convey the permit to another entity without permission of the City, nor could it change the use of the installations on the land from boatworks to commercial development without the City's prior written approval. Nor could Pacific American pledge the land and structures to a lender to secure a loan. Each of these core attributes of ownership were absent in the bundle of rights which Pacific American enjoyed as a holder of revocable permits. In light of the common law distinction between ownership and possessory interests, and the minimal rights Pacific American possessed as the holder of revocable permits, it seems clear to us that the term "owner"—as used in CERCLA—does not encompass such a permittee.

Moreover, this construction of "owner" liability best serves Congress's intent in enacting CERCLA. Given the permissive "authority to control" standard for operator liability adopted by this circuit,[9] "owner" liability need not be unduly expanded to resolve situations the other liability hook was intended to address. In conjunction with "operator" liability, the CERCLA framework holds liable both the passive *title* owner of real property who acquiesces in another's discharge of harmful pollutants on his real property or pollutes the land himself ("owner liability"), and the active (or negligent) operator of the facility who holds only a possessory interest in the real property but is in fact responsible for the discharge ("operator liability"). Congress struck this balance between two complementary forms of liability, and this court should uphold that legislative judgment. *See Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 551 (1937) (affirming that a court "cannot ignore the judgment of Congress, deliberately expressed in legislation.").

**[8]** Thus, applying the methodology of *Long Beach*, we hold that Pacific American, as a holder of the revocable permits described, was not an "owner" of the boatworks at Berth 44 for the purposes of CERCLA liability. Accordingly, BCI Coca-Cola, which purchased Pacific American's assets and liabilities, is not liable to the City of Los Angeles—the fee title owner of Berth 44 at all relevant times—for the costs of the environmental cleanup under CERCLA.[10]

---

[9]Under *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338 (9th Cir. 1992), CERCLA "operator" liability has been expansively interpreted by this court to extend to any party with the "authority to control the cause of the contamination at the time the hazardous substances were released into the environment." *Id*. at 1341. The Fourth Circuit adopted the same "authority to control" standard in *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837 (4th Cir. 1992).

[10]We need not reach the broader question whether any other property interest less than absolute title to real property—such as a lease—is sufficient to expose the holder of that interest to "owner" liability under CER-

### III.    Nuisance

The City brought claims against BCI Coca-Cola for public and private nuisance under California law. The district court granted summary judge for BCI Coca-Cola because the City failed to raise a triable issue regarding whether Pacific American knew or should have known of the pollution at Berth 44.

**[9]** California nuisance law follows the Restatement approach to public and private nuisance. *See People ex rel. Gallo v. Acuna*, 929 P.2d 596, 604 (Cal. 1997) (explaining California follows the Restatement in defining a public nuisance as the substantial and unreasonable interference with a public right); *San Diego Gas & Elec. Co. v. Superior Court*, 920 P.2d 669, 696-97 (Cal. 1996) (following the Restatement's definition of a private nuisance as requiring substantial and unreasonable interference with plaintiff's enjoyment of his land).

---

CLA. We suggest, without deciding, that Congress intended to limit "owner" liability to those individuals possessing all of the proverbial "sticks in the bundle of rights," including fee title to the real property. For the reasons provided above, we believe Congress intended to apply this historical meaning despite some efforts to expand the traditional interpretation of ownership. *See, e.g.*, *Pacific Coast Joint Stock Land Bank of San Francisco v. Roberts*, 16 Cal. 2d 800, 805 (1940) ("The term 'owner' is generic and being of general application is therefore frequently applied to one having an interest in or claim upon property less than the absolute and unqualified title."); *but see Auerbach,* 137 P.3d at 956 ("Notwithstanding the fact that a lease is a present possessory interest in land, there is no question that as a nonfreehold estate it is a different species of interest from a freehold estate in fee simple . . . ." )(quoting *Pacific Southwest*, 820 P.2d at 1051). However, we need not address the question of leases here because the revocable permits at issue conferred far fewer rights to the permittee than those granted to a typical lessee, such as those provided by the proverbial "99-year lease" at issue in *Commander Oil*. 215 F.3d at 330. As discussed *supra* at 3520, Pacific American's revocable permits vested fewer rights in the real property than did the lease in *Commander Oil*, and thus our result is not at odds with that of the Second Circuit.

**[10]** The Restatement sets forth two provisions detailing the requirements for nuisance liability:

> A possessor of land upon which a third person carries on an activity that causes a nuisance is subject to liability for the nuisance if it is otherwise actionable, and
>
> (a)   the possessor knows or has reason to know that the activity is being carried on and that it is causing or will involve an unreasonable risk of causing the nuisance, and
>
> (b)   he consents to the activity or fails to exercise reasonable care to prevent the nuisance.

Restatement (Second) of Torts § 838 (1979).

> A possessor of land is subject to liability for a nuisance caused while he is in possession by an abatable artificial condition on the land, if the nuisance is otherwise actionable, and
>
> (a)   the possessor knows or should know of the condition and the nuisance or unreasonable risk of nuisance involved, and
>
> (b)   he knows or should know that it exists without the consent of those affected by it, and
>
> (c)   he has failed after a reasonable opportunity to take reasonable steps to abate the condition or to protect the affected persons against it.

*Id*. at § 839 (1979). The City contends Pacific American *knew* or *should have known* of the pollution at Berth 44.

**[11]** The City contends Pacific American had actual knowledge that San Pedro Boat Works was discharging pollu-

tants based on the testimony of a San Pedro Boat Works employee named Klaus Korte, who testified San Pedro Boat Works routinely scraped off toxic paint from the hulls of boats during the period when Pacific American held the Revocable Permits. Neither Korte nor anyone else has testified he told Pacific American of this practice, nor was there any evidence presented that such hull scraping was observed by any employees or agents of Pacific American. The City's contention that Korte's knowledge should be imputed to Pacific American fails because San Pedro Boat Works's employee's knowledge can be imputed to San Pedro Boat Works only, not to Pacific American. *See W. R. Grace & Co. v. W. U.S. Indus., Inc.*, 608 F.2d 1214, 1218-19 (9th Cir. 1979) (holding the knowledge of an agent ordinarily is imputed to his principal); *Laird v. Capital Cities/ABC, Inc.*, 80 Cal. Rptr. 2d 454, 460 (Cal. App. 1998) ("[T]here is a strong presumption that a parent company is not the employer of its subsidiary's employees."). The City provides no explanation why we should deviate from the ordinary rule that an employee's knowledge may be imputed only to his employer, and not to the employer's parent company. Nor does the City address the district court's holding on summary adjudication that San Pedro Boat Works was not an alter-ego of Pacific American, a ruling that the City has *not* appealed. Therefore, we hold the district court did not err to the extent it held the City proffered no evidence that Pacific American had actual knowledge of the pollution caused by San Pedro Boat Works.

The City also contends Pacific American should have known, had Pacific American fulfilled its duty to investigate, that the boatworks was polluting or contaminating Berth 44 because the Revocable Permit obligated Pacific American to "keep and maintain said premises in a safe, clean, wholesome, sanitary and sightly condition." The City contends Pacific American's obligation that it "keep and maintain" the premises in good condition and free of pollution shows that it had a duty to investigate. *See* Restatement (Second) Torts § 839 cmt. I. Unfortunately for the City, § 839 applies only when

the defendant is "in possession" of the subject property. Pacific American may have had the *right* to possess the boat-works at Berth 44 for those ten months in 1969-70 under the Revocable Permits, but it was not "in possession" of the boat-works; San Pedro Boat Works was.[11] Hence, § 838, which refers to land which is leased to a third party, applies. Under § 838, Pacific American must have a "reason to know" of the pollution, which implies Pacific American must have been presented with some information that would make a reasonable person further investigate the issue. The City has not proffered evidence that Pacific American had a reason to know of the contamination.

**[12]** As Pacific American did not know or have reason to know of the pollution or contamination, it cannot be liable for public or private nuisance.

## IV.   Amendment of the Complaint

The district court denied the City's 2006 motion for leave to file a Fourth Amended Complaint to the extent the City sought to add another cause of action for breach of contract. The district court also denied the City's motion for reconsideration and imposed sanctions against the City. The City appeals the district court's decision to deny the City's motion for leave to amend.

We review the district court's denial of a motion for leave to amend a complaint for abuse of discretion. *DCD Programs*, 833 F.2d at 186. When reviewing a district court's decision for abuse of discretion, "[w]e first look to whether the trial

---

[11]It is unclear from the record whether San Pedro Boat Works' operation of the Berth 44 boatworks during the ten months in 1969-70 that Pacific American held the unassigned revocable permits in its own name was the result of a formal sub-let of the permit by Pacific American to San Pedro Boat Works, or instead was part of an informal agreement between the parent and subsidiary corporations.

court identified and applied the correct legal rule to the relief requested. Second, we look to whether the trial court's resolution of the motion resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

Federal Rule of Civil Procedure 15(a)(2) states: "The court should freely give leave [to amend a pleading] when justice so requires." But "the district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).

The district court found that the City unduly delayed seeking amendment. The claim arose in March 2003 when the City was served with San Pedro Boat Works's counterclaim. At a minimum there was a three-year delay. The City explains its delay as necessary in light of settlement negotiations in the related litigation. Even if that were established, no reason appears why the City could not have named BCI Coca-Cola in its contract claim in its Third Amended Complaint.

**[13]** More importantly, the City does not sufficiently refute the district court's finding that the contract claim would impose undue prejudice on BCI Coca-Cola by forcing BCI Coca-Cola to revisit extensive discovery. BCI Coca-Cola had already conducted five of six depositions of key witnesses before the City sought leave to amend its complaint for the fourth time. BCI Coca-Cola proffered evidence that it would be necessary to re-depose each of those witnesses, and to review thousands of pages of discovery, to investigate the Revocable Permits' intent, scope, and course of performance with respect to claims the terms and conditions in question had been breached by BCI Coca-Cola. BCI Coca-Cola has also shown it would be necessary to revisit its discovery to investigate affirmative defenses such as waiver, estoppel, laches, or ratification.

**[14]** Under these conditions, the district court did not abuse its discretion in denying the City leave to amend its complaint by adding a breach of contract action against BCI Coca-Cola.

## Conclusion

We affirm the district court's decision granting summary judgment to BCI Coca-Cola on the City's CERCLA and nuisance claims. Pacific American, and thus BCI Coca-Cola, lacked the necessary possessory interests in Berth 44 to establish liability under either theory. Further, the district court did not abuse its discretion in denying the City's motion to file its Fourth Amended Complaint.

**AFFIRMED.**