Filed 5/5/14  Syers Properties v. Rankin CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SYERS PROPERTIES III, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> ANN RANKIN et al., <br><br> Defendants and Respondents. | A136018 <br><br> (Alameda County <br> Super. Ct. No. RG10518323) |

### INTRODUCTION

Plaintiff Syers Properties III, Inc. appeals from a judgment in favor of defendants Ann Rankin and Terry Wilkens following the superior court's grant of defendants' motion for nonsuit in plaintiff's action against defendants for attorney malpractice and breach of fiduciary duty.  Defendants represented plaintiff in litigation brought by plaintiff against numerous defendants for construction defects in a new shopping center purchased by plaintiff.  That litigation settled, and plaintiff sued defendants, alleging that defendants had not timely pursued breach of warranty claims against shopping center tenants Ralphs and Longs, each of which had constructed its own building in the center, pursuant to ground leases with the previous owner of the shopping center assigned to plaintiff.

1

Plaintiff contends the court erred in granting defendants' motion for nonsuit, based upon the court's exclusion of evidence that defendants had not timely pursued breach of warranty claims against Ralphs and Longs. The court ruled that plaintiff had no claim against either Ralphs or Longs under their long-term ground leases, until such time as the leases expired or were otherwise terminated. Plaintiff also contends the court erred in ruling that mediation confidentiality rules operated to exclude numerous documents, including documents relating to damages measured by the costs to repair the buildings. Plaintiff further contends its damages were not speculative, but were recoverable against Ralphs and Longs in 2003.

## FACTS and PROCEDURAL BACKGROUND[1]

The El Dorado Hills shopping plaza known as The Market Place at Town Center (the Market Place), was constructed in the early 2000s by owner and developer Regency Realty Group, Inc. (Regency). The Market Place consists of two anchor tenants (originally Ralphs and Longs[2]), a number of small tenant shops between them ("the Shops") and "the Pad," consisting of four additional retail stores across the parking lot. Regency directly engaged general contractors to build the Shops and the Pad. The general contractor was initially I.C.E. Builders, but midway through the project, Tilton Pacific Construction (Tilton) took over as general contractor of that part of the shopping center.

Regency entered into development and ground lease agreements with Ralphs and Longs. As is customary in the industry and as contemplated in their lease agreements, Ralphs and Longs each retained general contractors to build their stores. Ralphs hired Tilton to build its store and Longs hired Reeve-Knight. Plaintiff characterizes the two

---

[1]As the judgment here is from a nonsuit, we state the facts in the light most favorable to plaintiff. (Eisenberg, et al. Civil Appeals and Writs (The Rutter Group 2013) ¶ 8:75, p. 8-38–8-39.)

[2]At the time of trial, the tenant in the Ralphs building was Nugget and CVS was the tenant in the Longs building. For the sake of clarity the buildings will be referenced by the names of the original tenants, Ralphs and Longs.

leases as "reverse build-to-suit" leases, wherein the tenant constructs a building for itself, using funds or financing provided in part by the landlord and occupies the building as a tenant under a long-term lease.

**A.** *Lease provisions*

The Ralphs lease and the Longs lease were each long-term, with the term and option for each exceeding 35 years. The Ralphs lease was 25 years long, with an additional 30 years of options. The Longs lease was 20 years, with 20 more years of options. During their respective 55 and 40-year periods, the leases gave Ralphs and Longs exclusive possession of the buildings they were to build. Their leases contained provisions granting the tenants exclusive use and quiet enjoyment of their buildings, free from the landlord's interference. The tenants were responsible for payment of property taxes, insurance and utilities. Any condemnation award was payable to the tenant, not the landlord. Casualty and reconstruction provisions of the Ralphs lease reflected the tenant's current possessory interest in the building and the landlord's reversionary interest.

The Ralphs lease provided the tenant was to maintain and repair the property at its own expense. The Longs lease provided the landlord was responsible for repairs "to the Premises' structural elements, exterior walls (including painting as needed), the HVAC, foundations, roof, including roof covering, floors (excluding floor covering), concealed plumbing or wiring, doors or glazing . . . ." All other repairs were the responsibility of the tenant, who was to deliver the premises in good condition and repair, ordinary wear and tear excepted at the end of the lease term and any extensions. The Ralphs lease provided the tenant was able to encumber its leasehold without landlord approval. The Longs lease required landlord approval for certain assignments or subleases, but also provided approval would not be unreasonably withheld. On early termination of the Ralphs lease due to Ralphs' ceasing its business operations or its assigning the lease, the landlord could terminate the lease and pay tenant a sum equal to the greater of the unamortized book value of the building, site improvements and fixtures paid for by the tenant or 50 percent of the "tenant's appraised value" of the leasehold. At the conclusion

3

of the lease, the tenant was to remove all trade fixtures, equipment, signs and personal property from the premises and surrender the premises to the landlord. Both leases contained attorney fees provisions. Both provided the landlord was to contribute specified sums toward the construction costs.

Both the Ralphs and the Longs ground leases contained express warranty provisions. The lease agreement between Regency and Ralphs dated July 6, 2001, contained the following express warranty in Article 4, titled "Construction": "4.11 Tenant's Warranty. Tenant covenants and warrants that the Market Construction will be performed in a good, workmanlike fashion and in accordance with (a) the approved Building Elevations, (b) this Lease, and (c) all applicable laws and regulations." The lease agreement between Regency and Longs, dated October 22, 2001, contained the following warranties in section 3, also titled "Construction": "3.3 Following delivery of the Building Pad, Tenant, at Tenant's sole cost, risk and expense, shall construct a Building having an area of approximately [23,435] square feet, together with the loading dock and sidewalk immediately adjacent thereto, on the Premises, which construction shall be in accordance with the approved Building Plans and Specifications for the Building as approved by Landlord and all applicable laws, ordinances, codes and regulations. . . ." It further warranted: "3.6 . . . The Building shall be constructed by Tenant in a good and workmanlike manner and in accordance with all laws, ordinances and regulations applicable thereto."

**B.** *Syers purchases the Market Place*

In December 2002, plaintiff purchased the Market Place for $27.5 million. As part of the purchase, Regency assigned the tenant leases, including the Ralphs and Longs ground leases to plaintiff. It also assigned its construction contracts with I.C.E. and Tilton for the Shops and the Pad. Plaintiff was not assigned the construction contracts that Ralphs and Longs had with their respective general contractors. The purchase agreement stated that plaintiff released Regency from any claims.

4

**C.** *Defendants represent plaintiff against the contractors*

In February 2003, during the first rainy season for the newly constructed Market Place, plaintiff was advised of significant water intrusion, leaks and cracks in the masonry and stucco, some of which appeared quite serious. In April 2003, Charles Syers met with defendant Rankin and signed an attorney-client contract on behalf of plaintiff. Syers understood defendants Rankin and Wilkens would oversee an investigation of the site, assess causes of the water intrusion, identify the rights, remedies and responsible parties, assess the damages and cost of repair, and prosecute a construction defects action. Defendants hired a team of consultants to determine the extent of the alleged defects, the cost of repair, and responsibility for the alleged defects, and to begin repairs as needed. It was particularly important to address the Shops, which needed immediate repairs in order to carry on business. (The Shops and the Pad are not part of plaintiff's claims in this action.)

A construction defect complaint relating to the Shops and Pad was filed by defendants for plaintiff against general contractor I.C.E., in April 2004. I.C.E. cross-complained against subcontractors. Early in the proceedings, the court issued Case Management Orders directing the proceedings. During the initial investigation, problems were found with the underground infrastructure and parking lot. Those issues were resolved, with plaintiff receiving $110,000 in settlement. Plaintiff does not challenge that settlement.

Rankin delegated to Wilkens the management of the case. Wilkens recommended plaintiff focus on the most urgently needed repairs, which were to the Shop and Pad. He advised plaintiff could defer, without consequence, the pursuit of construction defects claims for the Ralphs and Longs buildings. Wilkens was aware that evidence of construction defects had been observed at both the Ralphs and Longs buildings.

Litigation over the Shops and Pad lasted several years, from April 2004 through April 2010. The complaint was amended to add Tilton and other contractors. The repair estimate was approximately $1.6 million. After substantial discovery and multiple mediations and settlement conferences, settlement was reached in late December 2008 or

5

early January 2009. For case management purposes, the case had been divided into three parts: Shops and Pad; Ralphs building, and Longs building. Settlement on the Shops and Pads was reached in December 2008 or early January 2009 for $1.45 million; the contractors for Ralphs settled in February 2009 for $350,000 for damages related to that building; and the contractors for Longs settled in October 2009 for $725,000 damages to that building. Defendants continued to represent plaintiff until April 2010, when all of the settlement monies were collected and dismissals were entered.

Settlements totaled $2,635,000. However, Syers paid approximately $1.8 million in attorney fees and other costs to achieve the settlement, leaving a net recovery of approximately $829,000 for a total repair bill that Wilkens and others estimated would eventually cost approximately $3.2 million. Syers had spent close to $1.2 million for repairs, with further repairs needed. Syers asked Wilkens about the differential between plaintiff's initial demand of $1,219,000 million for the Ralphs building and the $350,000 settlement achieved. Wilkins counseled Syers to make a demand on Ralphs successor, Nugget, for sums that could not be collected against the Ralphs building contractors. However, Nugget representatives reacted negatively to the suggestion they were responsible for construction defects and they refused, asserting there was no legal basis for such demand. Wilkens refused to answer Syer's questions about the issue. In the meantime, Rankin sought payment from plaintiff of the final unpaid portion of defendants' bill.

### D. *Plaintiff's malpractice action against defendants*

On June 3, 2010, plaintiff filed its complaint against defendants for breach of express and implied contract, professional negligence and breach of fiduciary duty in failing to sue Ralphs and Longs.

During this litigation, plaintiff has asserted defendants were negligent in that they: (1) billed over $1 million to plaintiff for services related to suing the general contractors who built the Ralphs and Longs buildings, knowing they could not recover attorney fees from the contractors; (2) the general contractor of the Ralphs building refused to pay for masonry repairs, estimated at $700,000, on the basis that it was sued under a negligence

6

theory and not under its contract with Ralphs; (3) defendants failed to advise plaintiff of its rights and remedies under the construction portion of the Ralphs and Longs lease agreements and the express warranties contained therein; (4) Defendants failed to assert timely claims for construction defects against Ralphs and Longs and therefore permitted the four-year statute of limitations for making breach of warranty claims to expire in April 2007; and (5) Wilkens intentionally withheld information from Syers in September 2007, when he realized his mistakes.

Plaintiff also asserted, in the alternative, that the claim should have been tendered to the tenants (Ralphs and Longs), at which point, those tenants either would have fixed the defects on their own, or plaintiff would have sued them, prevailed, and recovered its attorney fees pursuant to the respective leases with those anchor tenants. Plaintiff also speculated that Ralphs and Longs could have joined plaintiff as a "plaintiff's team" in litigation against the contractors, such that attorney fees would have been paid by Ralphs and Longs or would have been recoverable under their agreements with their contractors.

Plaintiff sought as damages approximately $1 million in attorney fees and costs paid by plaintiff that plaintiff asserted Ralphs and Longs would have paid for the construction defect litigation involving their buildings and the cost to repair the masonry wall, estimated variously by plaintiff as $707,461 or $750,000. Defendants answered on July 23, 2010, and defendant Rankin filed a cross-complaint against plaintiff on behalf of her firm, seeking unpaid fees and interest totaling $97,438.84.

**E. *Defendants' motions in limine and nonsuit***

On October 14, 2011, defendants moved *in limine* to preclude plaintiff from presenting evidence of damages against Ralphs or Longs on the basis that no viable claims existed against either entity (*motion in limine # 1*). Defendants asserted no claim existed since both tenants (or their successors) were still in possession under their leases, they were paying rent, the leases had not been terminated by plaintiff, nor had they expired, and plaintiff was offering no evidence of damage to its only interest in the buildings—a reversionary interest. Defendants also asserted that both plaintiff's theory and the damages asserted by plaintiff were too speculative to support an action for legal

7

malpractice. On December 15, 2011, the trial court granted *motion in limine # 1*, following hearings on the motion and the submission of supplemental briefs.

The order granting the motion explained the court's reasoning and provided in relevant part: "This Court grants Motion in Limine No. 1 because plaintiff Syers Properties III, LLC, during the time that defendants represented plaintiff, did not have and never had a claim against either Ralphs or Longs under the leases. In making this ruling, this court makes no findings as to the intent of the parties and has not considered evidence other than the terms of the lease. . . . This court finds that the Ralphs lease and the Longs lease are ground leases. Ralphs built the building for itself. Ralphs did not build the building for benefit of the landlord (plaintiff). Similarly, Longs built the building for itself and not for the benefit of the landlord (plaintiff). The landlord (plaintiff) owns the land on which the improvement sits. The tenant (Ralphs) owns the building/improvement. Thus, Ralphs owns the building that it leases until such time as the lease expires or is terminated pursuant to the terms of the lease, at which time the ownership of the building transfers to the landlord (plaintiff). The Longs lease, though not identical to the Ralphs lease, requires the same conclusion—that Longs owns the building/improvement until such time as the lease expires or is terminated pursuant to the terms of the lease, at which time the ownership rights transfer to the landlord (plaintiff). *See,* California Practice Guide Real Property Transaction[s], Chapter 7-A, section 7:19; *Auerbach v. Assessment Appeals Board No. 1 for the County of Los Angeles* (2006) 39 Cal.4th 153 [(*Auerbach*)].)"

Discussion continued as to what issues remained to be tried to a jury and what evidence plaintiff could present in view of the court's grant of *motion in limine # 1*. The court initially indicated it would allow plaintiff to present evidence on issues of whether defendants properly advised plaintiff concerning the constraints of a ground lease, that is, that plaintiff would have to terminate the lease in order to enforce the warranty provisions.

Among the several other motions in limine brought by the parties was defendants' motion to exclude evidence or testimony assertedly protected by the mediation

8

confidentiality statutes (Evid. Code, §§ 115, et seq.). (*Motion in limine # 2*.) After several hearings, the court granted this motion. In doing so, the court found the case management orders issued by the court in the underlying construction defects action, from December 7, 2005 through October 2009, provided the framework under which the court was required to consider which communications and documents were covered by the mediation confidentiality statutes. (Evid. Code, §§ 115, et seq.) The December 7, 2005 case management order provided that Evidence Code sections 1119 et seq. and 1152 "apply to all mediation sessions, settlement conferences, and formal or informal expert meetings." The court excluded 46 specific documents that had been designated as proposed exhibits by plaintiff. Included therein was at least one expert deposition transcript—that of Scott Burke, plaintiff's cost of repair expert. Also included was a document titled the "Draeger Cost of Repair Estimate." This report was the basis offered by plaintiff for its claim that the cost to repair the masonry wall exceeded $700,000. The document specifically stated it was "FOR MEDIATION PURPOSES ONLY."

On June 5, 2012, a jury was empanelled. Plaintiff gave its opening statement. The trial court had indicated that plaintiff's counsel could talk about defendants' failure to advise plaintiff of the right to terminate the leases as a prerequisite to enforcing the warranty provisions. Plaintiff was precluded from referencing allegations that defendants had failed to pursue claims against Ralphs and Longs for the construction defects. Plaintiff was also precluded from mentioning defendants' failure to advise about the expiration of the statute of limitations for the express warranties. Plaintiff's counsel asked the jury to speculate that, had defendants asked, Ralphs and Longs would have voluntarily fixed their own buildings or filed suit against the contractors on their own. Alternatively, counsel argued that had defendants given plaintiff proper advice, plaintiff would have terminated the leases with Ralphs and Longs, would have succeeded in requiring them to fix their own buildings and would have recovered its attorney fees against them.

Defendants moved for nonsuit at the conclusion of plaintiff's opening statement on the ground that the statement did not mention or even allude to any recoverable

9

damages. The court took the motion under submission. After defendants opening statements, plaintiff began its direct examination of Syers.

On June 11, 2012, the court granted the defendants' motion for nonsuit, on the grounds it had previously determined that during the time defendants represented plaintiff, "plaintiff did not have and never had a claim" against either Ralphs or Longs under the lease agreements. The court then explained that "any evidence relating to the advice by the defendants to the plaintiff about terminating the lease is irrelevant . . . because the Court has already determined that [plaintiff] never had a claim." Plaintiff's counsel conceded that if plaintiff were precluded from producing evidence relating to the possible termination of the lease during the term of the lease, plaintiff had no other evidence to present.

Plaintiff and Rankin then agreed that Rankin would dismiss her cross-complaint for fees without prejudice and with a tolling agreement in accordance with Code of Civil Procedure section 360.5, until the earlier of a final decision on appeal or four years from the date of the agreement. The court discharged the jury. On July 16, 2012, judgment was entered in favor of defendants on plaintiff's complaint for professional negligence and breach of duty. On July 19, 2012, plaintiff appealed from that judgment.[3]

---

[3]Following the Supreme Court's decision in *Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, the question arose whether the dismissal of Rankin's cross-complaint without prejudice rendered the appeal here premature as in violation of the one final judgment rule (Code Civ. Proc., § 904.1, subd. (a)). On December 2, 2013, we issued an order denying defendants' motion to dismiss the appeal. We concluded that the appeal did not violate the one final judgment rule (Code Civ. Proc., § 904.1, subd. (a)), as the judgment was final as to a party—defendant Wilkens.

On January 9, 2013, defendants were awarded their attorney fees in connection with the action on the complaint. On January 11, 2013, plaintiff appealed the award of attorney fees. We address plaintiff's appeal of the attorney fee award in a separate opinion. (*Syers Properties III, LLC v. Rankin*, A137610.)

10

# DISCUSSION

## I. Standards of Review

### A. *Nonsuit*

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 (*Nally*).) "In determining the sufficiency of the evidence, the trial court must not weigh the evidence or consider the credibility of the witnesses. Instead, it must interpret all of the evidence most favorably to the plaintiff's case and most strongly against the defendant, and must resolve all presumptions, inferences, conflicts, and doubts in favor of the plaintiff. If the plaintiff's claim is not supported by substantial evidence, then the defendant is entitled to a judgment as a matter of law, justifying the nonsuit. (*Ibid.*)" (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541; see, e.g. *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 347 .)

"Since motions for nonsuit raise issues of law (*Loral Corp. v. Moyes* (1985) 174 Cal.App.3d 268, 272), we review the rulings on those motions de novo, employing the same standard which governs the trial court (*Nally, supra,* 47 Cal.3d at p. 291; [see *O'Neil v. Crane Co., supra,* 53 Cal.4th 335, 347; *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214–1215].) We may sustain the granting of the motion on any ground specified in the motion, whether or not it was the ground relied upon by the trial court. (*Lawless v. Calaway* (1944) 24 Cal.2d 81, 92–94; [citation].)" (*Saunders v. Taylor, supra,* 42 Cal.App.4th at pp. 1541–1542; see Eisenberg, Civil Appeals and Writs, *supra,* ¶ 8:223, p. 8-152.)

### B. *Legal malpractice*

In *Filbin v. Fitzgerald* (2012) 211 Cal.App.4th 154, 165–166, we discussed the legal framework of professional negligence actions against attorneys, stating :

" 'The failure to provide competent representation in a civil or criminal case may be the basis for civil liability under a theory of professional negligence. In a legal malpractice action arising from a civil proceeding, the elements are (1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession

11

commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence.' (*Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194, 1199.)

"Concerning the third and fourth of these elements, our Supreme Court cautioned: 'If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort. [Citation.]  The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence.' (*Budd v. Nixen* (1971) 6 Cal.3d 195, 200; cf. *Hecht, Solberg, Robinson, Goldberg & Bagley LLP v. Superior Court* (2006) 137 Cal.App.4th 579, 591 ['In the legal malpractice context, the elements of causation and damage are particularly closely linked']; 4 Mallen & Smith, Legal Malpractice (2012 ed.) § 37.15, p. 1509 ['Causation connects the element of fault to the fact of injury. . . .  [T]he question may be whether the claimed damage was caused by the alleged wrongful conduct.  The opposite perspective is whether the alleged misconduct caused legally cognizable damage.'].)

"From this caution has come the principle that 'Damage to be subject to a proper award must be such as follows the act complained of as a *legal certainty*. . . .' [Citations.]  Conversely, ' " ' [t]he mere probability that a certain event would have happened, upon which a claim for damages is predicated, will not support the claim or furnish the foundation of an action for such damages.' " ' [Citation.]

"To prevail in a legal malpractice action, '[s]imply showing the attorney erred is not enough.' [Citation.]  The plaintiff must also establish that but for the alleged malpractice trial or settlement of the underlying lawsuit would have resulted in a better outcome.  (*Viner v. Sweet* [(2003)] 30 Cal.4th 1232, 1244; [citations].)  'Thus, a plaintiff who alleges an inadequate settlement in the underlying action must prove that, if not for the malpractice, she would *certainly* have received more money in settlement or at trial.' [Citation.]"  [¶] "The requirement that a plaintiff need prove damages to 'a legal certainty' is difficult to meet in any case.  It is particularly so in 'settle and sue'

12

cases. . . .”  This case does not appear to be a typical “settle and sue” case, as plaintiff did not merely contend the settlement was inadequate, but rather argued that defendants failed to sue parties who were liable for the damages.  Nevertheless, the rule that plaintiff must prove damages to “a legal certainty” applies beyond such cases.  (E.g., *Agnew v. Parks* (1959) 172 Cal.App.2d 756, 768 [often cited as articulating the standard that “[d]amage to be subject to a proper award must be such as follows the act complained of as a legal certainty . . . .”]; Vapnek, et al., California Practice Guide: Professional Responsibility (The Rutter Group 2014) ¶ 6:326.13 [lost punitive damages award would be entirely too speculative.  “ ‘Because moral judgments are inherently subjective, a jury cannot objectively determine whether punitive damages should have been awarded or the proper amount of those damages with any legal certainty.’  [*Ferguson v. Lieff, Cabraser, Heimann & Bernstein, LLP, supra,* 30 Cal.4th at pp. 1048–1049]”.)

## II.  Breach of Duty, Causation and Damages

### A.  *Plaintiff had an ownership interest in the property that could have supported an action for damage to the reversion*

The trial court held as a matter of law that under the provisions of the Ralphs and Longs ground leases and despite the warranty provisions therein, plaintiff landlord had no claim against either Ralphs or Longs during the period plaintiff was represented by defendants, so long as these tenants or their successors continued to pay rent.  To the extent the court was holding that plaintiff had no interest in the property so long as the tenants (Ralphs and Longs) continued to pay rent, and therefore, defendants owed plaintiff no duty to either sue the tenants or to advise plaintiff it could terminate the lease and then sue the tenants, we believe it erred.  Nevertheless, as we shall explain, defendants’ nonsuit motion was properly granted.

We begin with some terminology:

“The term ‘ground lease’ is somewhat of a misnomer.  ‘Ground lease’ is simply a euphemism for a long-term lease, often involving vacant land upon which the tenant is permitted (or required) to build improvements.  A ‘ground lease’ has no defined legal significance and could just as easily be (and often is) denominated a ‘lease,’ ‘land lease’

13

or any other designation indicating a leasehold.  Thus, a ground lease involves all of the legal and practical issues associated with most any lease. . . . However, because of its extended term, the parties in many ways functionally treat the ownership and sale of a ground leasehold as they would the ownership and transfer of a fee interest." (Greenwald, et al., Cal Practice Guide: Real Property Transactions (The Rutter Group 2013) ¶ 7:1 (Greenwald, et al., Real Property Transactions).)  "Because the tenant is usually constructing and paying for the initial improvements or the renovation of existing ones, it often requires certain ownership rights in those structures during the lease term.  Ultimately, however, the improvements become the landlord's property (certainly, at the end of the lease term unless the landlord requires their removal).  [Citation.]"  (*Id.* at ¶ 7:19, citing *Auerbach, supra,* 39 Cal.4th 153, 162–163.)

In *Auerbach, supra,* 39 Cal.4th 153, the Supreme Court held that "for the purposes of Proposition 13, the lessor [of land subject to a 20-year lease] owns the building as well as the land," so that when ownership of the property changed, the building constructed after commencement of the lease also changed ownership so that it could be reassessed at its current market value.  (*Auerbach,* at p. 157.)  In determining that the lessor owned the buildings so that a sale of the property triggered reassessment, the court relied specifically on sections of the Revenue and Taxation Code for its determination that for reassessment purposes, "leasing property for 35 years or more changes ownership, even though technically the fee interest does not change, but leasing property for a shorter time period does not change ownership.  Conversely, a lessor's transferring property subject to a lease for 35 years or more does not change ownership (ownership had already changed when the leasehold interest was created), but transferring property subject to a shorter lease *does* change ownership."  (*Id.* at p. 164.)

The specific holding of *Auerbach* with respect to the triggering of reassessment depending upon the length of the lease as more or less than 35 years is limited by its Proposition 13 context and the specific statutes applicable in that context.  However, the Supreme Court's more general discussion about the distinction between freehold interests and leaseholds is instructive here:  "As we explained in *Pacific Southwest*, 'A freehold

14

estate is distinguished from other forms of estates in that it is of indeterminate duration [citations]. But an estate for years . . . is not a freehold estate. (Civ. Code, § 765.) Indeed, under California law an estate for years is not real property at all but rather a chattel real—a form of personalty—even though the substance of the estate, being land, is real property. (*Id*., §§ 761, 765. . . .) [¶] Notwithstanding the fact that a lease is a present possessory interest in land, there is no question that as a nonfreehold estate it is a different species of interest from a freehold estate in fee simple. . . . A leasehold is not an *ownership* interest, unlike the possession of land in fee simple. . . . It is for that reason that common parlance refers to the "owner" of a freehold estate, encumbered or unencumbered, but to the "holder" of a lease; the freeholder is seised of land, whereas the leaseholder is not.' (*Pacific Southwest* [*Realty Co. v. County of Los Angeles* (1991)] 1 Cal.4th [155,] 162–163, italics added.)" (*Auerbach*, *supra,* 39 Cal.4th at pp. 162-163.)

"It is hornbook law that a 'lessee has a present possessory interest in the premises, [while] the lessor has a future reversionary interest and retains fee title. [Citations.]' (*Avalon Pacific–Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC* (2011) 192 Cal.App.4th 1183, 1190 [(*Avalon*)].)" (*California State Teachers' Retirement System v. County of Los Angeles* (2013) 216 Cal.App.4th 41, 55.) Hence, the tenant holds the right to possession for a period less than perpetuity, while the fee simple owner (the landlord or lessor) retains the right to regain the property at a future date. (*Id.* at p. 55.)

The nature of the landlord's interest in the building during the tenancy in a long-term ground lease such as those at issue here and the landlord's remedies for breach of the long term lease are described in *Avalon, supra,* 192 Cal.App.4th 1183, a case similar in critical respects to this one. Appellant maintains that *Avalon* is not an appropriate guide because it involved repair and maintenance obligations under a long-term lease, rather than an alleged breach of warranty as in this case.[4] Appellant has cited no

---

[4]Although primarily concerned with repair and maintenance obligations under a long-term lease (10 years, with three five-year options to extend), rather than a construction warranty, the *Avalon* lease set forth tenant H.D. Supply's obligation to maintain and repair the premises and also provided that the tenant warranted to the

15

authority for treating these situations differently, nor does it make any reasoned argument *why* the analysis of *Avalon* should not apply here.  Both the cause of action based on warranty asserted here and that based on repair and maintenance obligations in *Avalon* were founded on the asserted breach of lease provisions.  In the circumstances presented, we see no basis to differentiate a breach of the lease warranty provisions from breach of the lease covenant to repair or maintain the premises.  Our discussion of the landlord's ownership interest and the damages it may recover applies to both types of breach.

In *Avalon,* the Court of Appeal reversed a jury verdict in favor of the landlord and the award of damages for the tenant's breach of the lease and for waste where both damage awards were based upon the cost of repairs.  (*Avalon, supra,* 192 Cal.App.4th at p. 1189.)  The court held that where the tenant who has breached its lease, nevertheless continues to pay its monthly rent and the lease is not terminated, the measure of damages was the diminution in value of the landlord's reversion interest—not cost to repair.  (*Id.* at pp. 1189–1190.)  As explained in *Avalon*: "The most significant facts, indeed the facts driving our decision, are that Avalon has not terminated the lease, the lease has not expired, H.D. Supply[, the tenant,] continues to pay Avalon monthly rent of about $50,000, and, contrary to Avalon's assertion, HD Supply has not abandoned the lease.  HD Supply, which remains the lessee, has the possessory interest in the leased property into at least 2017, while Avalon has a reversion interest.  [¶] *Those salient facts mean that Avalon's measure of damages for breach of the maintenance and repair covenants and for waste is the diminution in value of its reversion interest.*  Yet Avalon sought, and the jury awarded it, cost of repair damages, the measure of damages applicable when the lease has expired or been terminated and the lessor has regained possession.  By obtaining cost of repair damages without terminating the lease, while continuing to receive monthly rent, Avalon has been unjustly rewarded.  Avalon is having and eating the proverbial cake.  [¶] As we explain, under the terms of the lease, California case law,

---

landlord for three years after tenant's completion of removal and construction of certain structures that the proposed removal and addition was free from material defects.  (*Id.* at pp. 1191–1192.)

and prevailing law across the nation, a lessor may not recover cost of repair damages for breach of a lease's maintenance and repair obligations when the lease has neither expired nor been terminated. A lessor is limited to damages it actually suffered: injury to the reversion interest—the interest the lessor has in the leased property. Similarly, to recover for waste while a lease remains in effect, a lessor must prove the acts of waste caused damage that was sufficiently substantial and permanent to injure the lessor's reversion interest." (*Ibid.*, italics added.)

Guided by *Auerbach*, *supra,* 39 Cal.4th at pages 162–163, and *Avalon, supra,* 192 Cal.App.4th at pages 1189–1190*,* we conclude the trial court erred in determining that plaintiff had *no interest* in the Ralphs or Longs buildings under the lease. Rather, the landlord had its interest in the reversion and could seek damages for injury to that interest. (See *Avalon, supra,* at p. 1202 [recognizing the general rule that "injury to the reversion is the measure of damages when the lease has not expired or been terminated"]; *Gold Mining & Water Co. v. Swinerton* (1943) 23 Cal.2d 19, 25–26 [endorsing the rule that a landlord may recover cost of repair damages only in a lawsuit brought after the lease has expired or been terminated; before then, the landlord's damages are limited to the amount of injury to the reversion]; see Cal. Practice Guide, Landlord – Tenant (The Rutter Group 2013) ¶¶ 4:128.1, 4:198.1.)

## B. *Plaintiff could not recover cost of repair damages during the lease term*

The question then becomes one of proof of damages and *Avalon* also provides the basis for our determination that the grant of nonsuit was proper here. The only theory of damages proffered by plaintiff and the only evidence of damages plaintiff was prepared to present were *cost of repair damages*—not damages measured by the diminution in its reversion interest—and "some part" of the attorney fees it incurred in the underlying actions against the contractors.

As *Avalon* recognized, neither the lease nor California statutes and case law permit the lessor to recover cost of repair damages without terminating the lease. (*Avalon, supra,* 192 Cal.App.4th at pp. 1200–1201; see Civ. Code § 1951.2.) "To enforce the nonmonetary covenants of the Lease, such as maintenance and repair obligations, without

terminating the Lease, [the landlord's] remedy under the [provisions of the] lease was to sue HD Supply for specific performance." (*Avalon* at pp. 1200–1201.)

As outlined above, we "may sustain granting of the [nonsuit] on any ground specified in the motion, whether or not it was the ground relied upon by the trial court. (*Lawless v. Calaway* (1944) 24 Cal.2d 81, 92–94; [citation].)" (*Saunders v. Taylor, supra,* 42 Cal.App.4th at pp. 1541–1542; see *Castaneda v. Olsher*, *supra,* 41 Cal.4th 1205, 1214–1215; *O'Neil v. Crane Co., supra,* 53 Cal.4th 335, 347.) In their nonsuit motion, defendants argued, based on *Avalon, supra,* 192 Cal.App.4th 1183, that no viable claim for cost of repairs against Ralphs or Longs existed since both tenants (or their successors) were still in possession under their leases, they were paying rent, neither lease had been terminated by plaintiff or expired, and plaintiff was offering no evidence of damage to its only interest in the buildings—a reversionary interest.

Plaintiff never indicated, whether in its interrogatories, depositions, or arguments, that it would rely upon any injury to its reversionary interest as a potential source of damages. Even during the passage of more than six months between the granting of defendants' *motion in limine No. 1* in November and the empaneling of the jury in June, plaintiff never suggested that its reversionary interest had been damaged or that it would seek damages on any basis other than the cost to repair. Nothing in the record indicates plaintiff ever intended to present such evidence. The only evidence of damages that plaintiff sought to introduce was for costs of repair to the masonry wall and "some part" of the total litigation expenses in the underlying actions against the contractors, including attorney fees, costs and other expert fees and costs. Such evidence does not relate to any damage to plaintiff's reversionary interest. Nor does it come close to meeting the requirement that a plaintiff seeking damages for attorney malpractice must "prove damages to 'a legal certainty' . . . ." (*Filbin v. Fitzgerald, supra,* 211 Cal.App.4th at p. 166.) (Whether damages measured by the present value of the diminution in value of plaintiff's reversion interest more than 35 years in the future could ever be other than speculative is not an issue we need address here.)

**C.** *Plaintiff's alternative theories of causation and damages were inherently speculative*

Defendants also argued in their nonsuit motion that plaintiff's alternative theories and the causation link between those theories and the damages plaintiff sought were too speculative to support plaintiff's action for legal malpractice. We agree. Plaintiff's alternative theories—that defendants should have advised them to terminate the leases and then sue the tenants for the cost of repairs or should have teamed with Ralphs and Longs to sue the contractors—are so entirely dependent upon speculative scenarios, that they could not support judgment here. Counsel for plaintiff also asserted in her opening statement that had defendants given plaintiff proper advice, plaintiff would have considered pressuring Ralphs and Longs to do something and suggested plaintiff would have succeeded in requiring them to fix their own buildings or would have considered terminating the leases, in which case plaintiff could have recovered its attorney fees in an action against them. Sayers stated in a declaration that he would have considered a number of options, including terminating the leases, had he been properly advised of his options. Counsel had previously advised the court that Syers would testify that he had people "lined up" to lease these properties.

In *Filbin v. Fitzgerald, supra,* 211 Cal.App.4th at page 167, we quoted from *Barnard v. Langer* (2003) 109 Cal.App.4th 1453: " ' "A claim regarding an inadequate settlement often fails because it is inherently speculative. Negligence cannot be predicated on speculation that the attorney or another attorney could have secured a more advantageous settlement . . . . A client, who was a plaintiff, must establish not only that concluding such a settlement fell outside the standard of care, but also what would have been a reasonable settlement *and that such sums would have been agreed to and could have and would have been paid.*' [Citations.]" . . . (*Barnard v. Langer, supra,* 109 Cal.App.4th 1453, 1462–1463, fn. 13.)" (*Filbin v. Fitzgerald*, at p. 167, italics added.) The possibility, or even the probability, that certain events would have happened will not support a claim for damages or furnish the foundation of an action for such damages. (*Id.* at p. 166; *Barnard v. Langer, supra,* 109 Cal.App.4th at p. 1461; *Marshak v. Ballesteros*

(1999 ) 72 Cal.App.4th 1514, 1518.)  The plaintiff must also establish that *but for* the alleged malpractice, trial or settlement of the underlying lawsuit would have resulted in a better outcome.  (*Viner v. Sweet* [(2003)] 30 Cal.4th 1232, 1244; *Filbin v. Fitzgerald,* at p. 166.)  " 'Thus, a plaintiff who alleges an inadequate settlement in the underlying action must prove that, if not for the malpractice, she would *certainly* have received more money in settlement or at trial.'  [Citation.]"  (*Filbin v. Fitzgerald,* at p. 166.)

Uncertainties abound with respect to plaintiff's alternative theories.  Had defendants advised plaintiff that it could terminate the lease and then sue, it is far from certain that plaintiff would have done so, giving up its secure rent payments for a more risky lawsuit, despite counsel's argument to the contrary and representation that Syers, had he been advised he could terminate the lease, would have done so.  Although Syers declared that plaintiff had other interested potential tenants to whom it would have re-let the buildings, none were on the witness list.  Any evidence as to what absent third parties would have done is both hearsay and speculative and would have been inadmissible to show that these offers were actually made.

Furthermore, there is no evidence or indication that terminating the leases would have achieved the results sought by plaintiff.  No one from Ralphs, Longs, or their successors was listed on plaintiff's witness list to testify to what they would have done had a notice of default been sent.  Nor did plaintiff's opening statement indicate that any representative of these tenants would testify.  We cannot assume that Ralphs and Longs would have "certainly" either performed the repairs themselves, sued their contractors, or paid plaintiff's attorney fees without a fight.  Nor did plaintiff point to anything other than speculation that if pressed by defendants or threatened with a lawsuit, Ralphs and Longs would have voluntarily fixed their own buildings or filed suit against the contractors.

We conclude that plaintiff's alternative theories of causation and damages were so inherently speculative such that they could not support an award of damages in this attorney malpractice action.  The trial court did not err in granting a nonsuit.

### III.  Mediation Confidentiality and the Exclusion of Documents

The conclusion we reach above makes it unnecessary to address plaintiff's claim that the trial court erred in granting *motion in Limine # 2,* excluding from evidence 46 documents proffered by plaintiff on the ground they were protected by mediation confidentiality statutes.  (Evid. Code, §§ 1119, et seq.)  Nevertheless, we address the issue briefly.

As the California Supreme Court has explained:  "In order to encourage the candor necessary to a successful mediation, the Legislature has broadly provided for the confidentiality of things spoken or written in connection with a mediation proceeding. With specified statutory exceptions, neither 'evidence of anything said,' nor any 'writing,' is discoverable or admissible 'in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which . . . testimony can be compelled to be given,' if the statement was made, or the writing was prepared, 'for the purpose of, in the course of, or pursuant to, a mediation. . . .'  (Evid. Code, § 1119, subds. (a), (b).)  (All communications, negotiations, or settlement discussions by and between participants in the course of a mediation . . . shall remain confidential.' ([Evid. Code], § subd. (c).)  We have repeatedly said that these confidentiality provisions are clear and absolute. Except in rare circumstances, they must be strictly applied and do not permit judicially crafted exceptions or limitations, even where competing public policies may be affected." (*Cassel v. Superior Court* (2011) 51 Cal.4th 113, 117–118, footnote omitted.)[5]  "As the

---

[5]"Section 1119 governs the general admissibility of oral and written communications generated during the mediation process. Subdivision (a) provides in pertinent part that '[n]o evidence of anything said or any admission made *for the purpose of, in the course of, or pursuant to*, a mediation . . . is admissible or subject to discovery, and disclosure of the evidence shall not be compelled, in any . . . civil action. . . .'  (Italics added.) Subdivision (b) similarly bars discovery or admission in evidence of any 'writing . . . prepared for the purpose of, in the course of, or pursuant to, a mediation. . . .' Subdivision (c) of section 1119 further provides that '[a]ll communications, negotiations, or settlement discussions *by and between* participants in the course of a mediation . . . shall remain confidential.'  (Italics added.)  Exceptions are made for oral or written settlement agreements reached in mediation if the statutory requirements for disclosure

statutes make clear, confidentiality, unless . . . waived [pursuant to explicit statutory procedures], extends beyond utterances or writings 'in the course of' a mediation [citation], and thus is not confined to communications that occur between mediation disputants during the mediation proceeding itself." (*Id.* at p. 119, Italics omitted.)

The case management order issued December 7, 2005, in the underlying actions against the contractors, provided that Evidence Code sections 1119 et seq. and 1152 "apply to all mediation sessions, settlement conferences, and formal or informal expert meetings." The trial court found that the case management order created a presumption that documents and communications created during the time period during which mediation and settlement negotiations were held were covered by mediation confidentiality. The court invited plaintiff to show that the presumption was incorrect or that particular documents did not fall within it. Plaintiff was not able to do so. Plaintiff's counsel conceded that "the entire case is part of the mediation. Everything was part—all trial preparation is part of the mediation I think in that sense of the word, Your Honor. . . . I think the mediation absolutely involved the exchange—people talking about what their damages were."

On appeal, plaintiff argues the court erred in applying a presumption, rather than reviewing each document individually. However, plaintiff does not attempt to show that any *particular* document was *not* subject to mediation confidentiality or was erroneously excluded. It is plaintiff's burden on appeal to show not only error, but also prejudice from the exclusion of evidence. (Eisenberg, et al., Civil Appeals and Writs, at ¶¶ 8:285-8:292; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 282 [appellants "fail[ed] to demonstrate how any claim of error in the trial court's exclusion of evidence would have made any difference in the outcome"].) Even assuming the trial court erred (and we do not imply the court erred in applying the presumption in the circumstances presented), plaintiff has utterly failed to demonstrate it was prejudiced thereby.

---

are met. (§§ 1118, 1123, 1124; [citation].)" (*Cassel v. Superior Court, supra,* 51 Cal.4th at pp. 123–124.)

**DISPOSITION**

The judgment is affirmed.  Defendants are awarded their costs on this appeal.


_____
Kline, P.J.


We concur:


_____
Haerle, J.


_____
Brick, J.*


\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23